0098

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION AT COLUMBUS

CITIZENS AGAINST POLLUTION,
Plaintiff,

vs.

Civil No.: 2:04-CV-00371
Judge Gregory Frost
Mag. Judge Mark Abel

OHIO POWER COMPANY,
Defendant.

D E P O S I T I O N   O F

WITNESS: STUART BATTERMAN, Ph.D. (Volume II)

LOCATION: Offices of Patricia Murray & Assoc.
122 South Main Street
Ann Arbor, Michigan

DATE: January 6, 2006

APPEARANCES:

FOR PLAINTIFF: BAILEY & GLASSER
227 Capitol Street
Charleston, West Virginia 25301
BY: BENJAMIN L. BAILEY

FOR DEFENDANT: PORTER, WRIGHT, MORRIS & ARTHUR
41 South High Street
Columbus, Ohio 43125
BY: MOLLY S. CRABTREE

Reporter: Karen Klerekoper, CSR-4250, RPR

I N D E X

| WITNESS: STUART BATTERMAN, PH.D. | PAGE NO. |
| --- | --- |
| Examination (Con't) by Ms. Crabtree | 100 |

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
| --- | --- | --- |

(Exhibits not marked)

Ann Arbor, Michigan
January 6, 2006
At 9:05 a.m.

STUART BATTERMAN
HAVING BEEN CALLED BY THE DEFENDANT AND SWORN:
EXAMINATION (Con't)

BY MS. CRABTREE:

Q. Good morning, Dr. Batterman.

A. Good morning.

Q. When we left yesterday, I believe we were on 2.3.6 on page 16 of your report. Go ahead and flip to that.

This is a section entitled Goals of Ohio EPA Toxic Air Emission Policy Are Not Satisfied.

In here, you're talking about the MAGLCs, or MAGLCs, in Ohio; is that correct?

A. Yes.

Q. Are you aware of whether Ohio EPA has taken any measures to make the Gavin facility reduce its H2SO4 or SO3 to the MAGLC levels?

A. I haven't seen any evidence to that effect.

Q. Are you aware of whether the MAGLCs are mandatory limits?

A. I understand that there is some debate whether or not they are a policy or a guideline.

Q. What would you consider the MAGLCs?

A. Based on the fact that it's called the Air -- it's called a policy, I would take it for what it is. But, in essence, it's, you know, an attempt to regulate a pollutant to provide a protective level for the population. And, of course, all state agencies have a degree of flexibility in how they interpret their policies and guidelines and, for that matter, how they interpret standards.

Q. Do you know how often Ohio EPA reviews this policy?

A. I haven't reviewed that information.

Q. Turning to 2.3.7, on this same page, which is entitled Emissions of SO3/H2SO4 Are Ongoing and the 2002 Monitoring Data Remains Pertinent.

Again, where are those 2004 levels coming from that you cite here, this 10 to 15 parts per million, at both Gavin units?

A. I believe that these are values expressed as targets, more or less, for the Gavin units that were in materials that were prepared by Ohio Power. They were present in PowerPoints that we would talked about. They were present in depositions of Osborn that we also talked about yesterday.

Q. So these aren't coming from that Excel spreadsheet that we were talking about yesterday?

A. No, I don't believe they were.

Q. I think you answered this yesterday: Did you look at any actual stack test data from 2004?

A. I have not seen actual stack test data for 2004.

Q. Do you think that the 2002 ambient monitoring data that's summarized in your Table 1 are indicative of current levels of ambient concentrations in the Cheshire area?

A. I have to speculate on that because I have seen no ambient monitoring data for 2004 and, to my knowledge, none has been taken after 2002. So my speculation is based on things otherwise as they were in 2002. In that case, they would be representative.

Q. Have you seen any data that would indicate to you things have changed since then?

A. Since when?

Q. Since 2002.

A. Are we referring to 2006, 2004, 2005?

Q. Anything since 2002 that would indicate to you that the 2002 data may not be relevant?

A. Sure. For example, in 2002, only one of the SCRs was operating, and in subsequent years, both of them were operating. I think in 2003, only one of them was operating, but 2004 to the present, I believe both are operating.

Operation, as well known, SCRs will increase the quantities, the emission rates, of sulfuric acid precursors, SO3. So if the emission rates went up, then ground-level concentrations have a good likelihood of going up, since, as I indicated to you the other day, concentrations can be proportional to emissions.

Q. Moving on to page 17, which begins section 2.4 of your report, discussing exposure in the Cheshire community.

The first question for you is, you say that the plant is just a few yards from the road, do you actually know how far that is?

A. Well --

Q. Do you see where I am?

A. No, I don't.

Q. I'm sorry. It's right above 2.4.2, the paragraph that starts, "Beyond exposures." It's the last sentence in that paragraph.

A. Yeah. Well, I have driven down that road and, essentially, the road abuts the facility and, I believe, in fact, the Gavin plant has unloading facilities from the river on the opposite side of the road. So, essentially, the road doesn't drive through the property. I don't believe they own the roadway, but it's abutting.

Q. Okay. Do you know approximately how far the stacks are from the actual road?

A. I don't have a distance for you in meters, but it's a short distance. I have examined aerial views and I just don't have a recollection of how many meters or feet it is.

Q. Fair enough. In your 2.4.1, entitled Individuals Live in High-Exposure Areas, you reference from Table 6 in your report. If we could turn to that, please. It's on page 26.

Why did you choose just these 17 individual residences?

A. These were the CAP members whose names and addresses I was given. These were the extent to my knowledge of the CAP members who had provided that information.

Q. Do you know if this is all the CAP members or just a subset that you were given?

A. I do not know that for sure.

Q. Okay. Under distance, that's kilometers from the Gavin stacks or the Gavin property?

A. I think what I did here was to calculate the distance between the midpoint of the Gavin stacks.

Q. Between the two stacks side by side?

A. I calculated what we would call the midpoint, or the centroid, the point right in between the two, and I

believe I calculated distances from that --

Q. Okay.

A. -- that location. I think I've probably described that somewhere.

No, I just said from the Gavin facility stacks. Since the stacks are relatively close together, it's probably within the margin of error.

Q. There are two residences in your Table 6 that are less than 2 kilometers from that midpoint measurement; is that correct?

A. That's what I found.

Q. Did you use these distances to calculate an exposure risk to these residences based on the distance from the stacks?

A. Not directly.

Q. In the second nonitalicized paragraph in 2.4.1 --

A. Which page, please?

Q. I'm back on 17. It starts out, "The CAP members' residences." You have -- according to your Screen 3 dispersion model, the maximum ambient concentration occurred at downwind distance of about 1.24 kilometers downwind.

There are no residences listed in your Table 6 that are that close to that plant, correct?

A. The closest residence is approximately 1.4 from the

midpoint, given the plus or minus that I indicated before, were in that same realm of distance.

It's also, I think, understood with my -- with follow-up to the sentence that you have identified that, in fact, distances are -- I'm sorry, concentrations change only slightly as you move to slightly longer or slightly shorter distances.

Q. You have here the ambient concentration at 1.4 kilometers, which would be the closest residence in your Table 6, is only about 5 percent lower at this distance?

A. That's correct.

Q. What about the residences -- there are 2 residences, here at the top of your Table 6, which are 6.6 kilometers away. What would you expect the ambient concentration to be at that distance?

A. I think your question is asking me, if you could clarify, what is the concentration that I would expect Screen 3 would provide?

Q. Yes.

A. I don't know. I don't memorize the numbers that come out of a model like that.

Q. You say they go down by 5 percent when you go to 1.4 kilometers. Did you see by how much those predicted levels went down as you got further and further away

1/6/2006 Batterman, Stuart Day 2

from the plant?

A. Yes. Screen 3, in conventional application, using what is called an automatic distance array, in other words, it calculates concentrations at a variety of distances from -- I think I ran it from 100 meters to 10 kilometers -- will essentially calculate the concentrations at roughly 50 distances in between those two end points.

And I looked at what the concentration was at intermediate distances, for example, residences for Rose Gilles at 6.6, but I just don't recall. It's in the printout of the model. And the point here, in a typical application of Screen 3, is to look at worst case. I didn't look at -- focus my attention on distances beyond the worst case.

Q. But those distances would be in the Screen 3 results in your work papers?

A. In the model output, yes.

Q. Okay. Back on 17, the next paragraph down, you have: Also of concern are detections of the H2SO4 plume at locations of sensitive or vulnerable populations. And you talk about the River Valley School and the potential for exposure for children on their way to school, children who are exercising and children engaged in sports where they may spend considerable

1/6/2006 Batterman, Stuart Day 2

time outdoors.

Did you make any attempt to correlate the timing of plume touchdowns with when those children might be on their way to school or outdoors?

A. In general, the data don't permit that determination. The monitoring, as we talked yesterday, was sporadic, daylight hours. It's in the first, say, phase from 2001 to over the 2001 period. Averaging times were basically daylight hours, six to eight hours, typically.

You could not determine from a plume detection during the 2001 monitoring whether that would have occurred at a noon recess, whether it would have occurred when the students were inside. That information was not available from the 2001 data.

From the 2002 data, the sampling times were not always specified and, thus, I wasn't able to make that determination either.

In any event, as I talked about, my opinion regarding the adequacy of the monitoring is that that would not be a reliable determination.

Q. Okay. You talk about the children being outdoors. Is it generally true that if you were indoors, you have less of an exposure to ambient concentrations of H2SO4?

1/6/2006 Batterman, Stuart Day 2

A. That would be my expectation. I would say that there has been very little monitoring indoors of H2SO4, and the expectation is, yes, that there would be attenuation indoors, especially if windows were closed and air conditioners were on, so forth.

If the windows were open and there is a breeze present, and so forth, the attenuation would be reduced and exposures indoors would be higher.

Q. The last paragraph in this section starts, "Beyond exposures at home or in schools, CAP members and other community members may" --

A. I'm sorry, which section are you?

Q. The last paragraph in 2.4.1.

-- "may have exposure to H2SO4 plume at other locations where they may work, drive through or recreate."

A. Yes.

Q. When you are driving along Route 7 near the Gavin plant, the Kyger Creek and Gavin plants are quite close together, correct?

A. They are within a few miles, yes.

Q. The CAP members are actually describing symptoms and smells while driving along Route 7; is that your recollection?

A. A number of the reports from community members were

while driving, that's correct.

Q. Let's go ahead and look at Table 7, which details some of these complaints. It's on page 27 of your report.

Now, first one of the individuals you have listed here is Stinson. Do you know if that's Paul or April Stinson?

A. No, I can't say for certain because many of these are e-mails, and I don't recall whether it was signed Paul or April.

Q. You don't have any specific documents cited for this table summary. Do you know where you got all of these?

A. Yeah, I think most of these were in interrogatories that you have. They were also in e-mail evidence as well. That was provided electronically.

Q. Did you ever look at the handwritten diaries of the CAP members?

A. I have seen some handwritten materials, but I don't know that I would consider them diaries.

Q. What do they look like?

A. To my recollection, they look like they were on a pad, but I don't recall the details beyond that.

Q. Okay. So this -- these are complaints from two, perhaps three, different people then?

A. Well, I'm not sure how many because Stinson could

represent one or the others. Mulford is another individual. I'm not sure if it's a wife, husband, child, whatever. Several members, in any event.

Q. Probably five, or less?

A. My guess is that's correct.

Q. Okay. They detail some symptoms here. One of the first ones I see is a sulfur odor or sulfur taste.

Would you associate a sulfur odor or sulfur taste with sulfuric acid mist?

A. Well, I'm not probably able to judge how someone else characterizes an odor or a taste.

We know that olfactory response is very subjective, and people have different descriptors. These individuals have not been trained to characterize odors, and the way they characterize it is, as I indicated, subjective. So I would not rule out a sulfur odor and burning in a nose, and so forth, as an inappropriate descriptor for an untrained individual.

Q. Looking at these types of symptoms, is there anything else that could cause these kinds of symptoms?

A. Taken in isolation, there are other factors that could cause these symptoms.

Q. What would those factors be?

A. Nothing specifically comes to mind because I think,

taken in isolation, it seems pretty unlikely that you would have burning in nose and lungs or an odor as you drive past a facility that would likely be caused by something other than the sulfuric acid plume.

Taken in isolation, clearly you can get burning in your eyes if you've just eaten some spicy food or put your fingers in your eyes after touching an irritant, or something like this. So these are general irritant symptoms, and a number of factors can cause irritation.

Q. But you are saying in driving past a facility such as Gavin, you can't think of any other cause for these symptoms, other than the sulfuric acid mist?

A. No. I said it appeared to me to be unlikely, in my opinion, that other factors would cause this kind of response.

Q. I noticed in your resume, you have done some work with particular emissions from motor vehicles. If one of these individuals was driving by the plant in an open-top Jeep, is there anything in the vehicle emissions that might cause these symptoms?

A. An individual is driving in a open-top Jeep?

Q. Uh-huh.

A. In a properly operating vehicle, the emissions from that vehicle are discharged through the tail pipe at

the rear of the vehicle, and occupants shouldn't be exposed to very much of that. So I would suspect that the open-top Jeep would not produce a pollutant that the vehicle operator was having a particular problem with. Most people, when they have exhaust leaks, and so forth, would get that repaired. Certainly you can have exhaust leaks that make their way into the passenger cabin.

Q. If you are in an open-top Jeep closely following another vehicle, would you expect any of these symptoms as a result of the emissions from the vehicle in front of you?

A. Vehicles in front of you have been noted to produce concentrations within trailing vehicles. Whether or not it's open is probably not that significant of an issue.

Q. Would those emissions from the vehicle in front of you potentially cause any of these symptoms?

A. I think it's unlikely in most cases that properly operating vehicles would cause burning in nose and throat, lungs, and severe irritation symptoms for most individuals.

Q. Did you ask to see any medical record for the complainants of these symptoms?

A. I asked whether there were medical records available.

Q. What was the response?

A. I don't believe that medical records were available.

Q. Did you talk to any of them?

A. Talk to any of them, being who?

Q. Any of the people making these symptom complaints.

A. I met Mr. Stinson and chatted with him.

Q. Did you talk to him about his health complaints?

A. I think our conversation included his health complaints.

Q. What were Mr. Stinson's health complaints?

A. In the context of discussion, was very similar to what's been described in the report here. He described his -- the perceptions that he had when he believed he was exposed to -- when he would determine what he would call the blue plume.

Q. If there were medical records for these people complaining of these symptoms, would you consider them relevant to your analysis?

A. It would be helpful.

Q. Do you find it unusual that your Table 7 only includes a small number of people, we're both guessing five or less, based on the two last names?

A. Do I find it unusual? No, not really.

Q. Why?

A. Well, a couple of the reasons, I guess. First of all,

my understanding is that this is a company town and employees who are working for the firm, or who have connections for the firm, are quite hesitant to speak up. The town is relatively small. We have a population size, and in a population, you only have so many people who are willing to participate.

Sensitivities of individuals vary and, for example, in a town you might have so many children and only a percentage of those children, for example, would have asthma. And of those asthmatics, perhaps only a percentage of those would respond to plumes.

So there are a number of factors that tend to reduce the number of people who respond. I suspect a lot of individuals who had problems dealing with conditions -- and this is all speculation for me -- have left the town, were bought out. So it's not too surprising that the sample size in my table is small.

Q. I notice that the earliest complaint in your table is April of 2003. Do you know why you didn't have any earlier complaints?

A. I didn't actually attempt to provide a complete chronological record of complaints. My intention in this table was, in part, to show that there is a continuing problem that have community members responding and making complaints. I anticipated that

the earlier record is fairly similar, but I don't recall in detail what that looks like.

Q. Okay. Do you know whether any of these people in your Table 7 have asthma?

A. I'm not certain. I forget. I know that there are individuals in the community that have asthma.

Q. But you are not sure if it's any of these individuals?

A. I'm not sure if it's any of these.

Q. What about allergies?

A. I am not sure about that either.

Q. So is it fair to say, you are not familiar with the personal medical histories of the people listed in Table 7?

A. That's a fair characterization.

Q. Okay. How do you differentiate between symptoms caused by the Gavin SO3/H2SO4 emissions versus other ambient sources of SO3 or H2SO4?

A. In general, I think I would look for the correspondence between factors that would indicate that the Gavin facility is producing the exposures. And the concordance or simultaneity or near simultaneity from health responses from individuals in that community. Is that too technical?

Q. I'm looking at it now.

A. I would also look for the likelihood of exposures from

other sources that might produce H2SO4, or other types of irritants, and I would look at the totality of the complaints. In other words, not just look for cough but look for cough and irritation, other things that might help identify or confirm that the Gavin facility is the responsible agent.

Q. Did you, in fact, do that?

A. Well, it's difficult to do that, for a number of reasons. First of all, there is not much of a monitoring basis to determine whether there is an exposure of H2SO4, sulfur, nitrogen, or whatever else.

Second, the record is relatively limited in the monitoring, as I indicated, as well as at the emission side of things. I don't have the record of, say, day-to-day, hour-to-hour emissions or, for that matter, touchdowns or events that might produce higher concentrations. So it's a difficult task to do.

However, as I looked at sources in the area for irritant gases like H2SO4, and the proximity of these CAP members to the Gavin facility, it seems unlikely, in my opinion, that there is a significant alternative explanation.

Q. Did you look at any data on emissions prior to 2001 from the Gavin facility?

A. For H2SO4?

Q. Yes.

A. I don't recall looking specifically for -- I think I did look briefly for the TRI database, and I just don't recall what was in there.

Q. Did you check to see if there were any symptom complaints prior to 2001 similar to those in your Table 7?

A. I was given some information with symptom complaints, but I don't recall whether they preceded 2001.

Q. When I say "2001," because that's when the SCRs started, in the spring of that year.

A. That's right.

Q. Do you have any opinion as to the potential impacts of H2SO4 emissions prior to 2001?

A. I'm sorry, potential impacts?

Q. Potential health impacts.

A. Of sulfuric acid?

Q. Prior to 2001.

A. Yeah. I mean, sulfuric acid is sulfuric acid. It doesn't matter whether people haven't changed in two years. You are talking about the emissions from Gavin, I assume?

Q. Yes.

A. Okay. As well understood in combustion, there will be some sulfuric acid produced during a combustion coal

without the SCRs, and this was referred to as pre-SCR levels, I believe. And those concentrations are on the order of single digit, typically, in the flue gas effluent.

So there's certainly emissions of H2S04 from Gavin beforehand. But it's also well understood that introduction of SCRs provided substantial increases in H2SO4 emissions.

So prior to 2001, there certainly were emissions of H2SO4 but at levels that were a fraction of what we saw in 2001.

Your question, I think, is it my opinion that those concentrations of H2SO4, prior to installation of SCRs, is cause to health effects? Is that your question?

Q. Yes.

A. The answer, I think, I would have is that, yes, it could possibly, along with the other pollutants emitted from the facility, be involved in adverse health effects.

Q. Back to page 17 of your report, I'm looking at section 2.4.2 entitled Individual Symptomatology is Consistent With Exposure to the H2SO4 Plume.

In the italicized portion of this, you say: The record of complaints from CAP members regarding

odor, irritation, coughing and breathing difficulties most associated with sightings and local touchdowns of the Gavin plume is consistent with exposure to high concentrations of H2SO4.

Do you know if those individuals reporting the symptoms were actually in a visible plume touchdown?

A. Well, my recollection is that some of them said: I drove through the plume and my eyes started to hurt, and so forth.

Based on that, I would assume some of them were immersed, I guess you could say, in the plume.

In other cases, people would say: I saw a touchdown and it moved this way, and it covered the area.

In that case, I guess I would assume that, yes, they were again within the plume, in quotes.

Q. Speaking about a visible blue plume, does there need to be a visible plume for there to be a health risk to individuals?

A. No. In fact, there doesn't need to be necessarily the perception that they have irritation as well.

Q. What do you mean by that?

A. Irritation has been often regarded as a canary. So the canary dies, you know you have a problem in the

coal mine. But, in fact, there can be health effects that occur below levels at which individuals perceive, and that's well understood with this particular contaminant.

Q. Those health effects that can occur below a perceived level, are those permanent health effects?

A. They can be.

Q. What are the permanent health effects that did occur below a perceived level of irritation?

A. Well, for example, you won't smell formaldehyde, but formaldehyde below a certain level you won't smell it, but below a certain level it's associated with cancer.

Q. What about with H2SO4?

A. H2SO4, based on fairly robust, in concordance with literature and clinical studies, is associated, as I state in section 2.5, a number of respiratory effects, including lung function, particle clearance, and so forth.

Q. Okay. You had talked about irritation being regarded as a canary and that there could be permanent health effects below a detectable irritation. What are those permanent health effects associated with sulfuric acid that would occur below a level of irritation?

A. Well, as I indicated, that there can be changes in pulmonary function. There can be changes in

clearance. There are likely to be secondary impact from that, for example, greater sensitivity to cope with other pollutants exposures, or subsequent pollutant exposures.

Q. Are all of those permanent symptoms or transitory symptoms?

A. It's unclear in some ways. Lung function, for example, can often rebound. On the other hand, the effect of having an exposure in terms of other health end points is unclear. The effect of repeated exposures is also unclear.

Q. Let's go ahead and move to 2.5, since we seem to be talking about it anyway. Health effects of H2SO4. I'm looking at 2.5.1, on page 18. The first nonitalicized paragraph there says: Numerous studies have shown adverse health impacts with low to moderate concentrations of H2SO4 and acute duration exposure studies in both humans and animals.

You go through in the rest of this section and detail some of those.

I didn't see any animal studies in the studies that you list in your report. Is there a more comprehensive list of those studies, other than what you specifically cite in the text of your report?

A. Yeah. I think that, in fact, somewhere I cited that

ATSDR provided a review. One of your experts working at Gradient Corp in 2002 provided a review. And he's altered some of that in his expert report of 2005 as well.

There is reviews in the TLV documentation for this pollutant. There are reviews in some of the other documents that I have cited. It wasn't my opinion -- rather, my task here to review all of that information.

Q. So you looked at these reviews of the relevant literature. You didn't necessarily look at each of those underlying studies in those reports?

A. No. I also reviewed a number of those reports, and you deposed -- rather, you requested my documents, and some of the studies are provided there. And in some cases, I went back to the pre-electronic age and got some of the early studies that were only available, rather fragile journal volumes hidden in the library somewhere.

Q. You mentioned the 2002 Gradient report. Did you consider that a reliable review of the literature?

A. I didn't really make an opinion whether it was reliable or not.

Q. But you did cite it several times in your report, so did you consider -- if you cited it in your report,

would you consider it unreliable?

A. I don't recall exactly where I cited it. It would help to see that.

Q. I had that. It's on 17, first paragraph under 2.5. You had cited it here on --

A. Yes, I see. That's just a fact that it's a review there that attempted to update the ATSDR. My opinion as to whether it's reliable, was that your question?

Q. Yes.

A. It provided some additional references, and I reviewed those references, and my opinion is really that it was useful for discussing the more recent literature, particularly in terms of identifying additional studies.

Q. Okay. You also cited as a source in your Table 1 on page 23, in there, I think it's actually in the footnote there. It says: Location inferred from Gradient 2002. Then you listed again as a source for that table.

A. This has nothing to do with the health effects. This has to do only with locations, I believe.

Q. Okay. That answers my question, then.

Back on page 18, midway through the first nonitalicized paragraph, the sentence starts, "This has been demonstrated in individuals" --

A. I'm sorry, I don't see where you are.

Q. Fourth and fifth lines into the first nonitalicized paragraph: Exercising asthmatic children have shown adverse health effects to H2SO4 at concentrations of 70 micrograms per cubic meter.

A. Yes, I see that.

Q. How many studies did you review show clinically noticeable results at 100 micrograms per cubic meter or less?

A. I don't recall the numbers of studies. I mean, there are not many studies of exercising asthmatics, that is certainly the case.

Q. Would you say less than 10 studies show clinically noticeable results at less than 100 micrograms per cubic meters?

A. I'm don't think there have been even 10 studies that have looked at very low concentrations of H2SO4.

Q. So it would be less than 5?

A. Yes.

Q. And the size of the aerosol makes a difference in whether the symptoms will occur; is that correct? I'm looking at the second to last line in that same paragraph. You talk about the factors influencing the health responses.

A. Yes.

Q. What do you mean by the size of the aerosol?

A. Atmospheric aerosols can be characterized by a number of properties. One of them is the size, and it's well understood that the size determines the penetration of the aerosol into the airways and down into the lung.

Q. Do you have any opinion as to the size of the aerosol, the $H_2SO_4$ aerosol, emitted from the Gavin stacks?

A. Well, it's not been characterized before. It's a difficult measurement to make. It can be made.

The size distribution is likely to be what aerosol scientists would characterize as polydispersed. In other words, it's a range of sizes.

Q. How would you go about characterizing the size of the aerosol?

A. Well, I haven't thought about this. The typical ways of capturing sizes of aerosols include devices from impacters to -- to more sophisticated particle sizers, and so forth. This is an area of very active research right now in trying to characterize the health effects of PM10, PM25, ultrafines, and so forth.

Characterizing them for this aerosol is particularly challenging because it's quite dynamic and can change in time. The aerosol is quite fragile. It's quite reactive. And so a lot of these techniques might not work very well. So I don't have the answer

for you on how I would do it today. It would be a research project.

Q. When you say it is quite reactive, what do you mean by that?

A. Well, it's a very soluble aerosol. So the presence of a surface, for example, that might be used could affect the results that you get.

This is why, for example, when you are trying to determine exposures to acidic aerosols, you typically try to use things like denuders to remove caustic or basic constituents in the atmosphere that might neutralize the acid. It's just a technical challenge to do it for this particular aerosol.

Q. What is your understanding of why the plume is blue sometimes?

A. It's a combination of absorption and refraction of the aerosol with incoming light and the angle, and so forth, of the observer with respect to the incoming light, and the location of the particles.

Q. Is it in part due to water vapor clinging to the sulfuric acid particles?

A. Well, the water vapor will -- I don't know if the term is "cling" that I would use, is -- is important in understanding the aerosol and, yeah, it's probably a certain humidity range would affect the blueness, if

you will, of the plume, although I haven't seen -- this is speculation on my part because I haven't seen any scientific studies that really show the effect of water vapor with respect to the blue plume.

Typically, there is enough water vapor to produce $H_2SO_4$ from the emissions of sulfur trioxide. The effect of the additional water vapor is unclear to me.

Q. Would you expect any of the $H_2SO_4$ aerosol to be submicronmeter?

A. In diameter?

Q. Yes.

A. A possibility, as I indicated, that it is a polydisperse size distribution.

Q. Do you have any opinion as to what portion of it would be submicronmeter in diameter?

A. I haven't seen evidence that indicates that proportion in a reliable manner.

Q. I'm looking at the second nonitalicized paragraph in 2.5.1, five lines from the bottom of that paragraph, you reference a conference -- a concentration of 120 micrograms per cubic meter, and then a reference, these levels are approximately twice those that cause adverse health effects, increased respiratory

resistance in the previously cited ATSDR report.

Is that the 70 micrograms per cubic meter study of asthmatic children that you referenced above? I'm not sure which portion.

A. I think it is. I think for some reason number 66 micrograms sticks in my mind as well, but 70 is close to that, so it could be the same one.

Q. But 120 micrograms per cubic meter isn't twice the level of most of the studies that you looked at that cause clinically significant effects?

A. No. As I stated, these are approximately twice. There is a plus or minus in all of these measurements.

Q. You said these measurements are approximately twice. I'm saying is the 120, approximately, twice the levels that you saw in other studies, other than the one with the asthmatic children?

A. I don't recall. There have been a couple of studies looking at levels below 100. I selected this one because it was useful in that it incorporated asthmatics as subjects.

Q. But most of the studies looked at concentrations greater than this 120 microgram per cubic meter; is that correct?

A. My -- yeah, my recollection is that most of them are looking at higher concentrations, and also not at

asthmatics and not at children.
Q. Okay. The last paragraph in this section, last sentence of that, you say: Since the odor threshold exceeds the level at which adverse health effects occur, odor does not serve as a reliable warning to individuals who might be exposed.
What kind of warning do you think individuals need if concentrations are below 1,000 micrograms per cubic meter?
A. Well, in fact, at the end of this report, I talk about types of warnings that might be used, and these are provided, I think, in section 2.6.2.
Q. So these are the same warnings?
A. No. You asked -- your question was what types of warnings. I'm trying to answer your question.
The types of warnings might be to provide sirens, to provide -- what do you call it -- telephone SMSs, whatever we call them, things like this, similar to what we do for ozone alerts, and so forth.
The warning would say: As we practice now via a number of mechanisms, including radio, television, e-mails even, to individuals in Michigan, perhaps in Ohio, elsewhere -- I'm not sure -- this is not a good day to exercise outdoors, limit your activities outdoors, that sort of thing. This is not

uncommon for ozone. And it's directed primarily at asthmatics, although others are sensitive to effects of pollutants.
Q. So the warnings you are talking about here are the warnings you are talking about in section 2.6, correct?
A. No. I didn't, in fact, in this paragraph, try to extrapolate to the application of these warnings, which is what 2.6 does. Here I'm simply stating that in this case, odor does not operate as a canary.
Q. Okay. Turning to 2.5.2 of your report entitled Occupational Exposure Limits For H2SO4 Are Approached and Likely Exceeded in the Cheshire Community.
You note, first off, it should be noted that occupational guidelines and standards are designed for the occupational setting and, thus, may not be protective for the general public.
Isn't it true, though, that occupational standards are designed for exposure eight hours a day, five days a week, for an approximate work life of 25 years?
A. All those are, in fact, approximate. I think if you go into the history, you will see six hours or eight hours or ten hours, depending on the time, because these things have been around since, I don't know, for

decades.
The work life has also not actually been stated explicitly recently, so I don't know that it's approximately 25 years or approximately more or less.
Q. You think that those levels of exposure are not as protective of the community as the community standard? Let me ask that in a better way.
A. I can answer that.
Q. Go ahead.
A. Reading on in the paragraph, this was noted decades ago in the 1974 recommendations from NIOSH. They said they were not designed for the population at large and any extrapolation, and so forth, is not warranted.
This applies in general to other contaminants that may have exposure limits or guidelines. This is not a surprise to any health professional. I can give you examples where limits in the occupational setting are reduced by substantial fractions to provide protection of the community at large.
Q. I think you do that later on in your report.
A. I don't think I did.
Q. Talking about the California REL?
A. No.
Q. What's an example, then, where they were --

A. For example, the current occupational limit for sulfur dioxide, which is perhaps the best study and well characterized, gas in the occupational setting is 5 ppm for the 8-hour exposure that you were just discussing. Whether it applies for 40 hours in 25 years, is fine. I will take that.
So the limit is 5. I believe that NIOSH has a TLB of 2, a little more protective than what OSHA enforces. But the SO2 National Ambient Air Quality Standard, which is designed to provide protection to the public, is set, I believe, at 0.03, which is on the order of 100 times or several hundred times lower than what the occupational standard is.
Q. Is that because individuals in the community are there 24 hours a day?
A. In part, but that doesn't explain the magnitude of the difference entirely. In fact, it hardly explains.
Q. What explains the difference?
A. A number of factors: Occupational standards are designed for typically healthy workers. They are designed for workers who are dealing with a relatively limited number of simultaneous co-exposures.
They are designed to protect -- I'm sorry, the ambient standards would be designed to protect vulnerable, susceptible individuals; for example,

pregnant women, asthmatics, HIV or immunocompromised individuals, so forth. So there are additional reasons that have been quite well developed and explained in the literature that can help explain the more protective -- or, rather, the lower levels that are used for protection of the general public as compared to workers in occupational settings.
Q. I'm looking at the first paragraph on page 19. You talk about the ACGIH exposure limits. That's the American Conference of Governmental Industrial Hygienists.
You reference in 1989 that a short-term exposure limit or ceiling of 3,000 micrograms per cubic meter for a 15-minute period.
Is that short-term exposure limit still there in the ACGIH materials?
A. I don't recall for sure. I'm just citing what they did in 1948.
Q. Do you know if there is a short-term exposure limit?
A. For H2SO4?
Q. Yes.
A. My mind is blanking this morning on me. I should have stated it in here, and reading down -- and this paragraph, ACGIH revised it, as you can read.
Q. Uh-huh.

A. The previous limits were assigned as STELs, short-term exposure limit, is now 3,000.
Q. Right. Then there is another revision in 2004, which you reference in the next paragraph. But you don't reference the short-term exposure limit in that. I just wondered if that meant that the short-term exposure limit is still 3,000 micrograms per cubic meter?
A. I just don't recall whether they revised. I recall the document in detail, but I just don't recall that specific.
Q. Did you see any data that would indicate to you that there was an exceedence of a short-term exposure limit of 3,000 micrograms per cubic meter in 2001 or 2002?
A. Would you clarify, any evidence or any data, is that what --
Q. Yes.
A. No. The only data that exists that would be applicable for your question is the monitoring data, and the maximum short-term concentration that was monitored in the vicinity of the plant was, I believe, 2,410, and that's below 3,000.
But, of course, the STEL is a 15-minute period, and the 2,410 is over a one-hour period. So as I talk about later in the report, there is

possibility that a 15-minute average, had it been available, could have been above 3,000, even though the 1-hour average was not.
Q. You reference in the third paragraph on this page, that the ACGIH levels and values are -- the last sentence of this paragraph -- often adopted by authorities as standard including cognizant authorities in the United States.
Do you know what authorities have adopted the ACGIH, TLVs and STELs?
A. Well, I mean, typically OSHA, state agencies, and so forth, will adopt them.
Q. Do you know of any --
A. Internationally, they are looked at quite closely as well.
Q. Do you know of any authority who has adopted them as safe levels for community exposure?
A. No. Typically, what a community level -- community guideline or standard will do is take something like a TLV, in the absence of any other standard, and then apply a safety factor to it, typically a factor of 10. And then use that as a health-based guideline, or I wouldn't call it standard typically. So they are used in that context, but they would not be simply taken out and used one for one.

Q. Why is that factor of 10 generally used; do you know?
A. I didn't say it was generally used. There are complications of factors that range from 1 to 2.5 to 10 to 100, and so forth. 10 is just an example of a safety factor.
Typically, safety factors are used for a variety of reasons, and it would depend on typically a review of the individual situation that would include the uncertainty associated with the health end point, the significance of the health end point of whether there was animal data that was the basis or human data that was the basis of the TLV or other standard.
Many other factors would make the determination what the appropriate safety factors should be.
Q. Now, give you an example here where you could have a very high peak concentration that, over a seven- or eight-hour averaging period, actually yielded a low concentration.
But is the opposite also true, if you had a 1-hour averaging time and your concentration for that one-hour averaging time was 300 micrograms per cubic meter, would that mean that the 15-minute averaging time could be lower than that 300 micrograms per cubic meter?

A. The maximum could not be lower, no. That's not a correct interpretation.

You have to think, if you will, of an hour being, say, broken into 4 quarters, each 15 minutes long. If your average over the 1-hour period is, for example, 300, which was the hypothetical you just placed to me --

Q. Uh-huh.

A. -- then at least 1 of those quarters would have to be above 300.

Q. That makes sense. 2.5.3, which is called reference levels -- reference exposure levels for H2SO4 are exceeded in the Cheshire community.

You are talking about these RELs, what exactly are these RELs?

A. Well, on the bottom of page 19, I define it, continuing on to 20, RELs defined as the concentration level at/or below which adverse health effects are anticipated for specified exposure duration.

Q. Those are community standards, then?

A. They are intended normally to be community standards, yes.

Q. In the next paragraph, you say: The most comprehensive assessment of RELs has been performed by the State of California.

Why do you say that that's the most comprehensive assessment?

A. Well, I haven't seen too many others assembled, for one thing, and California normally does a pretty consistent job, and their environmental staff are often leaders and, generally, what comes out is useful.

Q. Do you know if Ohio has any assessments of RELs, or has done any assessments?

A. I believe I searched and I didn't find anything; otherwise, I think I would have reported it.

Q. Does the exceedence of an REL inevitably mean an adverse health effect?

A. No. Exceedence of a concentration if no one is there, doesn't mean anyone is harmed, as we discussed yesterday.

Q. What if there is a healthy individual there. So that exceedence of that REL necessarily mean an adverse health effect if there is exposure?

A. For an individual case, I can't determine whether or not there would be an adverse health effect.

RELs are typically devised in a manner which it is believed, as was stated, that exceedence could cause an adverse health effect.

Individuals' sensitivity, vulnerability,

susceptibility, what you may -- whatever you may want to call that, is known to vary tremendously.

For example, asthmatics, we find often have responses to air pollutants to air levels that are far lower than what a healthy individual would have and, thus, community standards were typically designed to try to be protective of more susceptible members in the community.

This is well accepted and the basis, for example, of ambient air quality standards.

Q. Okay. Moving to 2.5.4, which is entitled Emergency Guidelines For H2SO4 Are Exceeded in the Cheshire Community.

You reference these AEGLs, and you reference an AEGL-1. There are actually AEGL-2s and 3s, correct?

A. That's correct.

Q. Why don't you reference these in your report?

A. Well, a couple of reasons. First of all, AEGLs are, as I mentioned, exposure guidelines applicable to rare, maybe one-time-in-your-life events, like a fire explosion. They are not designed to provide a guideline value for a situation which might occur repeatedly over time.

And when I see an emergency situation, and

I mentioned, for example, a sulfur fire yesterday to you, it's very useful for professionals to have indications of what are emergency guideline levels so they can issue warnings like evacuate the area.

So these levels that are developed by NRC, EPA, and others, are essentially devised to provide that benchmark value for decisions of whether to evacuate, shelter in place, or do something else.

Q. Would you expect exceedence of AEGL-1 to prompt evacuation?

A. No. Typically, AEGL-1 would be -- let me retract that.

Evacuation is sought with all types of difficulties, and most of the emergency response professionals will know that you can cause a lot of damage by calling for an evacuation.

This kind of damage can include panic, it can cause people to be outdoors more, in buses and cars, or whatever, or largely unprotected against a toxic gas release. So it is with great reluctance that any firefighter, captain, whatever, would call for an evacuation. This is well understood.

So AEGL-1 would -- if it was felt it would not escalate into a more hazardous situation, would normally not call for an evacuation, rather than

something like shelter in place might be more appropriate. But it's really hard because it depends on the particulars in the particular scenario. You haven't specified the scenario. You have just said "in general."

Q. Are you aware of any circumstances where there was an evacuation after an exceedence of this AEGL level of H2SO4?

A. At Cheshire?

Q. Ever.

A. I haven't looked for that. As I indicated before, I would be surprised if it was called for.

Q. Let's look at 2.5.5, and then we can take a break before we go to 2.2.6.

A. You are making me go extra long this morning.

Q. We can take a break if you would like.

A. I'm fine.

Q. How would you define an adverse health impact?

MR. BAILEY: Are you asking him how he defines it?

MS. CRABTREE: Yes.

MR. BAILEY: Some of these questions...

A. I think in this case, what I have written here is that adverse health effect would include these cases including acute irritation, a change in pulmonary

function, clearance of breathing, exacerbation of asthma. I would include all of these as adverse health effects.

BY MS. CRABTREE:

Q. If the health effect went away after a period of time, say an hour, or was a transitory effect, would you still consider it an adverse health effect?

A. I do consider that an adverse health effect.

Q. You say in 2.5.5 that the sulfuric acid releases have resulted in adverse health effects.

What specific evidence do you rely on for the fact that the sulfuric acid has resulted in those adverse health effects?

A. Well, first we have the symptomology of the individuals that's documented. I think that was in my report, a summary in Table 6; is that correct?

Q. I think it was 7.

A. You are correct, Table 7.

Q. Show that symptomology?

A. That's called symptomology --

Q. Uh-huh.

A. -- of what the people are experiencing as reported by their symptoms.

Second, we have limited, but useful in cases, monitoring data that indicates levels can go

above those that have been shown in well controlled, say, clinical settings to cause several health effects, adverse health effects.

We have visual evidence with this blue plume. We have modeling evidence that indicates levels can exceed 100 or, not more, micrograms. Again, the totality of the evidence is that, in my opinion, there is a -- is consistent.

Q. You list some specific adverse health effects. I just want to cover a couple of these to make sure I'm clear on them. You have acute irritation, changes in pulmonary function.

What is a change in pulmonary function that would be a result of sulfuric acid exposure?

A. Well, for example, on a pulmonary function test where we are looking at the resistance and the flow of breathing, we will see substantial changes in those parameters.

Q. But, again, you haven't actually seen any of these tests run?

A. I haven't looked at the medical records, so I don't know if individuals in Cheshire actually had pulmonary function tests performed.

Q. What about altered -- I'm not going to get that right -- mucociliary clearance?

A. Exactly.

Q. How do you define that?

A. This has to do with the removal of materials from the lung.

Q. How would you measure that?

A. This can be measured in some clinical tests.

Q. Again, you haven't seen any medical records or clinical tests from the CAP members or other Cheshire individuals?

A. No, I haven't.

Q. You mentioned exacerbation of asthma. What do you consider exacerbation of asthma?

A. Well, there are a number of ways to characterize exacerbation of asthma. You can look at symptomatology. You can use pulmonary function tests. You can use the frequency and severity of indicators like wheeze. You can look at asthma medications, the frequency and the cost of medications. You can look at emergency room visits. You can count asthma attacks; you can look at days home from school or work for children or adults respectively. There are many ways to look at exacerbation of asthma.

Q. But, again, not to be redundant, you haven't seen any medical records or clinical evidence of this?

A. In the Cheshire community, I have not.

Q. Okay. The last part of 2.5.5, you say that the Gavin facility will continue to represent an imminent and substantial endangerment to public health.

Is "imminent and substantial endangerment to public health" a toxicological term of art?

A. Can you clarify a toxicological term of art.

Q. Is a term of art to you, in your profession?

A. I'm not familiar with the word "term of art," the phrase of "term of art."

Q. Is it a common phrase in your profession?

A. The words "imminent," "substantial," are common.

Q. I'm talking about the phrase "imminent and substantial endangerment to public health."

A. To me, it's essentially recognizing -- well, your question was, is it common? I don't know. I have never researched whether this is common or not.

Q. I asked because it reflects some legal language in the statutes at issue. I wasn't sure if it was also a common phraseology in what you do.

If it's not, then I guess my next question to you is, what does this mean to you, imminent and substantial endangerment to public health?

A. To me, it means that there is a concern of substance that represents a public health threat; that actions should be taken to provide what I would consider

reasonably protective mitigation, or actions that are reasonably protected to mitigate the potential for health adverse -- you are getting me tongue-twisted -- for adverse health effects.

MS. CRABTREE: Why don't we go ahead and take a break.

(A recess was taken)

BY MS. CRABTREE:

Q. Turning to 2.6 of your report, on page 21, where it starts -- entitled Recommendations to Minimize $H_2SO_4$ Exposures and Risks. You recommend an emission limit of less than one part per million; is that correct? This is the first bullet point under 2.6.1.

A. No. As it stated, I recommended essentially a lower numerical and verifiable limit on emissions. And I didn't calculate the value exactly. Clearly there are a number of ways to calculate that, but if we wanted to keep ambient concentrations below an REL of approximately 120, I think this number would provide that.

Q. And that number being the 10 grams per second?

A. As an example of a number that would provide that.

Q. You footnote at the end of that bullet point, and can you walk me through this rollback method that you used to come to that limit?

A. Sure. Do you need additional clarification beyond what's in the footnote?

Q. Let me ask you this: If you took the maximum ground-level concentration from the ISC modeling that you did, which was 130 micrograms per cubic meter, using your rollback method, what would the emission limit in grams per second or parts per million to keep emissions under 120 micrograms per cubic meter?

A. I would be very reluctant to approach it in that manner. The rollback can be based on modeling that way, but in the case where a model is performing poorly, you would be ill advised to do it that way.

Q. If you did do it that way, what would the new emission limit be?

A. That, I can't answer with much clarity either because I don't know, in fact, what the emissions of $H_2SO_4$ precursors were that corresponded to the 2,410 micrograms per cubic meter exceedence or measurement.

Q. But putting aside the 2,410 --

A. But I can't put that aside -- I'm sorry, let me hear you out.

Q. Okay. If the maximum concentration had been 130 micrograms per cubic meter, what would the new emission limit need to be to keep emissions under the referenced exposure level of 120 micrograms per cubic

meter?

A. That's what I thought you were going to say. I still -- I can't tell you precisely without making some assumption with respect to what the emission limits -- rather, what the emissions were during the time of the -- I'm sorry, the 100 -- I'm twisted now.

I would -- in the case of the modeling, where we assume in my modeling something on the order of 17 or 18 ppm, producing 130, we would need to reduce that by something on the order of 10 percent. Rather than being 17 or 18, it would be 15 or 16.

Q. Okay.

A. But, as I indicate, I would be reluctant to suggest that. So suggesting, that's an inappropriate methodology.

Q. On the fourth bullet point in this section, you say the numerical emission limit is better expressed as a maximum hourly emission rate rather than as a stack gas concentration.

Why is it better expressed as a maximum hourly emission rate?

A. For a couple of reasons, although it can be argued that you can derive it either way. But, typically, stack emission rates are provided in terms of a maximum rate in grams per second, grams per hour, tons

per year, and so forth.

This has the advantage of incorporating both what I would call the volumetric flow, in other words, in this Gavin facility, which is a base-load facility, but we have seen some degrees of ups and downs in terms of its power production. That emission limit expressed in terms of an hourly emission rate automatically accounts for those ups and downs. So it's preferred and commonly used that way in permit applications.

Q. Underneath that bullet point, you say that better control technology is available and feasible that can provide enhanced removals of $SO_3$/$H_2SO_4$ emissions and is currently installed at Gavin.

What are those control technologies?

A. Well, I didn't provide an extensive review of control technologies. I have examined a bit of the evidence with respect to the record at Gavin and, for example, I know that they tried additional approaches, including lower sulfur of coal. They are moving to lower catalysts. There was water injection, magnesium hydroxide injection, lime injection, trona injection.

Typically, the way I look at these things is as an optimization to try to provide combination of techniques that is effective. That's what they have

tried.

What they haven't tried are other types of systems to provide more effective $SO_3$/$H_2SO_4$ control. For example, wet scrubbers are also known to provide higher removals.

Q. Wet scrubbers?

A. Wet precipitators, I'm sorry.

Q. Wouldn't a wet -- an ESP is an electrostatic precipitator, is that what you are talking about?

A. Yes.

Q. I have heard them referred to as wet ESPs.

A. Wet ESPs, yes. They already have a sulfur scrubber at Gavin.

Q. Wouldn't a wet ESP actually reduce the exit temperature of the plume?

A. As I indicated, they approach these things as a system. The temperatures that are passed through the ESP are a function of many operating parameters. So you might make adjustments elsewhere in the system to maintain temperatures at some potential, what you feel is acceptable.

Currently the temperatures at Gavin stack are very low. In the modeling, I think we used temperatures of 120 or 130. It would be not difficult to adjust the process conditions to get temperatures

that are higher or lower from that.

Again, in terms of considering the overall system design, I would be concerned about performance of the pollution controls. I would be concerned about the impact on plant efficiency. I would be concerned about a number of different factors. I would approach it as a systems problem.

Q. Other than wet ESPs, what other control technology do you feel the plant has not tried?

A. Those are the things that come to mind right now.

Q. You say that these control technologies are feasible. Have you done any feasibility study?

A. No, I haven't done a feasibility study.

Q. Have you evaluated any cost to install or maintain any of these suggestions that you make?

A. I have seen some numbers in the record that examine cost of some of these things and -- but I haven't seen what I would consider to be a systematic assessment of the -- of the technical options.

Q. Did you make any assessment of whether any of these options would have any ancillary emission impacts? And I will give you an example: When the SCR went into service to reduce nitrogen dioxides, there was an increase in the $SO_3$/$H_2SO_4$ that we are talking about today. Would any of these options that -- have you

looked at any of the options that you suggest to see if there would be similar ancillary impacts on emissions?

A. Well, there are interactions between these things, and again, I'm coming back to the systems perspective because typically you look at a facility as a whole.

And I understand that injections of different materials can affect, for example, particle resistivity, which influences efficiency of your particular removal device if you are using an ESP. But I haven't done a systematic assessment.

In particular, that's one of the reasons this case is interesting, because it provides a -- it demonstrates the complexities that occur when you don't necessarily have a systematic view of emissions and, you know, the kinds of outcomes that can result.

Q. You mentioned earlier that it would not be difficult to get higher exit temperatures. What would you do to get those higher exit temperatures?

A. At Gavin?

Q. Yes.

A. Well, I haven't done an engineering analysis at Gavin. I mean, I have various parameters that they can control to affect temperatures. They have various feed rates that they can control to affect

temperatures, and so forth.

My experience is that other utilities have in the past altered temperatures for various reasons. And Gavin doesn't seem to be any different from that and, certainly, they understand that, how to do this.

Q. You have said that temperatures have been adjusted in the past, that you have seen. On what -- by how much?

A. I can't recall offhand numerical value at specific locations in the facility. I mean, temperatures at this facility range from, you know, very, very hot at the boiler to just a little bit above ambient temperature at the stack. So, I mean, it depends where you are talking, and so forth.

For example, a facility like this will adjust conditions to reduce slagging issues, and so forth, on a fairly routine basis. If they are finding that temperatures drop at a location where it's important to maintain a temperature for some process condition, they will adjust that. So these things are done quite routinely.

I don't know what capabilities they have numerically, but they certainly have the ability to do that. That's critical for the operation of this kind of facility.

Q. In this, you mentioned the use of higher quality coal.

What do you mean by higher quality coal?

A. This is largely referring to the sulfur content of the coal.

Q. Okay. As a sulfur content goes down -- let me rephrase that.

Are you aware of any equipment difficulties with using low-sulfur coal at plants that were designed to burn high-sulfur coal?

A. Yeah. In particular, in this case, I believe the deposition of Osborn has a discussion that the lower-sulfur coal -- I'm not sure if that was Wyoming coal -- but produced, I think it was slagging problems, but I'm not sure how much this was actually investigated.

Typically in a facility like this, you want it to last for many, many years. You make short-term tests. You make some short-term corrections, but it does take some time to sort of get the process down and it operates in the kind reliability we like to see for base-loading facilities, which is very high standards to obtain -- to maintain, rather.

But it's not clear to me that that couldn't be achieved with a use of a different coal, from the high-sulfur coal.

Q. Is it your opinion that it's possible for a coal-fired facility with a scrubber and SCR to achieve emissions of 1 part per million of SO3?

A. I don't know. I have seen -- I would say -- I would characterize no consistent information on -- I wouldn't say consistent, but representative emission information on SO3.

My expectation is that given the fact that SO3 removals haven't been routine, that knowing on the order of a percent or so of sulfur in a typical boiler will be converted to SO3, and knowing that certain removals, depending on the specifics of the plant, what kind of pollution-control system, that there will be a certain fraction of SO3 emitted.

My guess is probably that this limitation of 10 grams per second -- is that the one you are referring to?

Q. Uh-huh.

A. Would be difficult to achieve at a large facility like Gavin.

Q. Turning to page 22, we talked about you -- you talk about monitoring plan here. And we talked about that a little bit yesterday, as to how you would have changed the ambient monitoring plan. But in 2.6.2, it's entitled Additional Measures to Mitigate

Exposures and Risks.

Before the bullet points, one of the things you identify is exhaust gas reheat and increase stack velocity -- stack gas velocity.

What is involved in achieving increased stack gas velocity?

A. I'm sorry, which bullet points?

Q. Right under the italicized portion.

A. Got it. Your question was?

Q. What exactly is involved in achieving increased stack gas velocity?

A. I don't know the details at Gavin but, typically, you have fans that might have to be run at a higher power to produce a greater velocity.

Q. Anything else?

A. At Gavin, I don't know the specifics that would be involved.

Q. Okay.

A. There could be redesign of the stack, or the termination of the stack but -- and that might have some other engineering consequences. Again, I don't know the specifics at Gavin.

Q. Moving to your bullet points on this page, the first bullet point says: Continuous observation and monitoring of conditions in the area. What do you

mean by that?

A. Well, there are a couple of things. As I stated here at the onset, I didn't provide a comprehensive assessment of all the additional mitigating measures that might be used. That's a -- that requires more analysis, which I simply didn't have time to provide.

As other pollutants, typically we try to measure them continuously so that we understand the kinds of concentrations that are likely to occur.

In a case of a power plant, the typical type of monitoring that work that might be used could include sighting of continuous monitors at what we call hot spots of locations where plume touchdowns, if you will, are likely to occur. It might include locations that are where populations are most likely. Those would be considered population-oriented sites.

It might include background sites to get at the question as to whether there are other sources that might provide, in this case, $H_2SO_4$ exposure. So this is just an example of the way that you would try to develop a spacial and temporal understanding of the pollutant levels for the purpose of, well, you know, protecting public health and understanding things like frequency of plume touchdowns.

Q. Okay. You go through and identify several suggestions

here. Are you saying that the types of suggestions that you are looking at here, and some of them are pager alerts, you mentioned before the SMS text on phone, sirens, websites.

Are you saying that these should be put in place to warn residents anytime that emissions from the Gavin facility exceed 10 grams per second?

A. There is really two parts to my answer. First is, I'm not saying that specifically these are the appropriate measures that should be used. I said, in the first case, these are measures that might be used. And it would be based on what local individuals feel is appropriate, what is feasible to do, and many other considerations.

For example, I don't know definitively that people have e-mail; or if they don't have e-mail, e-mail is not appropriate.

The second part is, the emission limit is designed to be protective in ensuring with a high degree of likelihood that there will not be high concentrations in the area. And if you had emissions as low as, for example, 10, then most likely you would not have plume touchdowns that would result in high levels of $H_2SO_4$ and adverse health effects.

As I state, I think in the italicized part,

that these measures will be especially important if emission limits do not approach that level. And I would infer, and I would ask you to infer from that, then with low levels of emissions, these measures would not be necessary.

Q. When you said 10, you meant 10 grams per second?

A. 10 grams per second.

Q. Not 10 parts per million?

A. That's correct. That's stated in the written record, but I need to say it.

Q. I just want us to be clear.

You don't necessarily have an opinion as far as which of these measures should be used, but they are more of suggestions of things that could be used?

A. Well, I stated yesterday that the primary intent of this report was not to design these measures; instead, it was to do a couple of other things. But I do have some opinions about what I think would be appropriate and useful.

Q. What are those, or what is that?

A. Well, there are a number of them. And they are certainly going to include better monitoring, and potentially some of the other points as well.

Q. Which other points?

A. Well, I haven't thought about the others in much detail yet for the purpose of your question.

I think it's actually quite appropriate to provide some sort of warning system to residents, and which is appropriate, I can't say offhand because I don't know the community that well. But certainly, as I have noted here on page 22, including the footnote, these types of strategies are becoming commonly employed in areas that have problems meeting air-quality levels that are protective.

And as an example, in Michigan, we have e-mails that are sent out. We have websites where you can see alerts. We have a variety of mechanisms aimed at alerting especially susceptible individuals not to go outside, limit their outdoor activity. It's on the radio and elsewhere. These are inexpensive and they can be effective.

In a case of the Cheshire situation where you have a fairly major road going through the area, the possibility of acute effects for individuals driving through, it's a little more problematic.

Cars, even with windows closed, don't provide tremendous attenuation of pollutants; in other words, pollutant concentration outside the vehicle is typically not all that much different from the

concentration in the cabin of the vehicle. And this applies in cars even if you have the windows closed, and so forth. It helps a little bit but not a lot. That's a bit more problematic to deal with.

And I don't know how to address that sort of situation, or other inadvertent exposure, except by limitations that essentially remove the source of the problem.

Also, I would have to say that the philosophy of air quality and public protection is to put the burden on the polluter and that responses like requesting the individuals to wear personal protective equipment is generally not the desirable strategy.

Q. What personal protective equipment would that be for sulfuric acid?

A. For example, you might wear a mask which neutralizes the acid. It's not very appropriate, in my opinion, to ask people to wear those masks while they are exercising.

Q. What ambient level would you consider high enough to prompt an evacuation of Cheshire?

A. An evacuation of Cheshire?

Q. Yes.

A. For H2SO4?

Q. Yes.

A. I would go back to some of the emergency response guideline limit values, and I think, as you indicated, I didn't provide what the second levels were in this report, and offhand I don't recall what they are either. It's likely to be on the order of 1,000 or several thousand.

Q. So that second level would be a good guideline for evacuation?

A. That would be a guideline. There are a number of guidelines that are available.

There are a couple of other limits that are cited in my report and, in fact, you know, the NRC has levels here of 1,000, 2,000, 5,000. This depends on the duration of exposure, as I mentioned to you, and, you know, we understand that the -- if it is a duration that is likely to be long, then things like sheltering in place may not be very effective. And so if the duration is long, we might consider a lower number to be appropriate. If the duration is short, we might expect a higher number to be appropriate. And, in part, that's the reason for the multitude of guideline limits and emergency limits that we have.

You know, most of the numbers are in the thousands of range; and how many thousands, 1,000 or 5,000, it depends on a number of factors.

Q. You mentioned yesterday, when you were at the plant for a site visit that you saw a tinge of blue plume. Did you experience any health effects when you were there?

A. Yes.

Q. What health effects did you experience?

A. In climbing up the boiler, it was very hot, but I was far out of the plume and I was sweating profusely, but I had no effects due to the H2SO4.

Q. Are there any opinions that you plan to offer that are not contained in your report or that we have talked about in the past two days?

A. That I will offer when and where?

Q. If the case were to go to trial, in your testimony.

A. Possibly, sure.

Q. What other opinions are those?

A. Well, first of all, it would depend on what I was asked, I think.

Q. Are there any specific additional opinions other than what is in your report and that we have talked about, that you plan to offer at trial in this case?

A. The only one that comes to mind right now is the Valburg's report on mine -- discusses the epidemiological evidence, and I didn't provide any depth on that in this report. And so that's one area

which could come up which I might have an opinion on.

Q. Were you asked to prepare a rebuttal report?

A. No, I don't think I have.

Q. Did you know that you had an opportunity to prepare a rebuttal report?

A. I think Jim Hecker and I discussed the possibility.

MS. CRABTREE: If we can just have two minutes, I think I'm done.

(Discussion off the record)

MS. CRABTREE: I thank you for your time, Dr. Batterman. That's all the questions I have for you.

THE WITNESS: Thank you.

MR. BAILEY: We are done. We will read it.

(Deposition concluded at 11:05 a.m. Signature of the witness was requested)

CERTIFICATE OF NOTARY

STATE OF MICHIGAN )
) SS
COUNTY OF OAKLAND )

I, Karen Klerekoper, a Notary Public in and for the above county and state, do hereby certify that the above deposition was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, and nothing but the truth; that the foregoing questions asked and answers made by the witness were duly recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to either party nor interested in the event of this cause.

Karen Klerekoper, CSR-4250, RPR
Notary Public,
Oakland County, Michigan

My Commission expires: 10/7/06

90e37073-a97e-4252-b038-d843a2d1fb0f

PATRICIA MURRAY & ASSOCIATES, INC.
The Court Reporters

Offices in Brighton
& Ann Arbor

10524 East Grand River
Brighton, MI 48116

810-229-8238
800-875-8238
Fax 810-229-5789
Pat@murrayreporting.com

Date: 6/19/06

TO : Molly S. Crabtree
Porter, Wright, Morris, and Arthur

Re: CASE: Cap v. Ohio Power Company

DEPONENTS: Stuart Batterman, Ph.D

DATE: 1/5/06, 1/6/06

Enclosed please find the original transcripts of the above deposition(s) and attendant exhibits, if any.

☐ The errata sheet and signature page are enclosed.

☒ There has been no response from the witness. We are forwarding the original to you, assuming that signature has been waived.

Sincerely,

Patricia Murray & Associates