# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

CITIZENS AGAINST POLLUTION,

       **Plaintiff,**                                   Case No. C2-04-CV-371
                                                            JUDGE GREGORY L. FROST
      **v.**                                                      Magistrate Judge Abel

**OHIO POWER COMPANY,**

       **Defendant.**

## OPINION & ORDER FILED UNDER SEAL

Defendant Ohio Power Company ("OPC") moves the court for summary judgment on count one of Plaintiff Citizens Against Pollution's ("CAP") Amended Complaint. (Doc. # 51). CAP opposes the motion (Doc. # 64), and OPC has filed a reply (Doc. # 76). For the reasons that follow, the Court **DENIES** the motion. (Doc. # 51).

## EVIDENTIARY ISSUE

Preliminarily, CAP objects to two expert reports that OPC filed in support of its motion. (Doc. # 64). Specifically, CAP argues that because the reports of Dr. Deborah Gray ("Gray") and Dr. Peter Valberg ("Valberg") lack authenticating affidavits, those reports are inadmissible within the current context. *Id.* at 17. OPC counters that the reports do contain the signatures of those individuals on the cover pages of the reports in compliance with Fed. R. Civ. P. 26(a)(2). (Doc. # 76 at 9 n.26).

In making this objection, CAP appears to have forgotten the stipulation it entered into with OPC that was filed with the Court on January 31, 2006. (Doc. # 53). That stipulation stated that the "reports by each party's proposed expert witnesses, which are (or may be)

1

attached to their respective motions for summary judgment and subsequent briefs, are true and accurate copies...." *Id.* at ¶ 15. As a result, the Court **OVERRULES** CAP's objection and the Court will consider the reports of Gray and Valberg[1] when considering the instant motion.

## BACKGROUND

CAP is a non-profit Ohio corporation whose purpose is, *inter alia*, to "seek increased awareness of pollution sources in Cheshire, Ohio." (Doc. # 14 at ¶ 6). It boasts eighty-two (82) members, all of whom reside in or near Cheshire. OPC is a wholly-owned subsidiary of American Electric Power, Inc. (Doc. # 53 at ¶ 2). OPC is the owner and operator of the General James M. Gavin Power Plant ("Gavin Plant") in Cheshire, Ohio. *Id.* at ¶ 1.

The Gavin Plant is a coal-burning facility. (Doc. # 51 at 1). It has two electric generating units and two 830 foot stacks. (Doc. # 16 at ¶ 9). Sulfur trioxide and sulfuric acid are byproducts of coal combustion. (Michael Durner Report at 3). Both sulfur trioxide and sulfuric acid pass through various equipment before exiting the stack as part of a flue gas. *Id.* The equipment removes some, but not all, of the sulfur trioxide from the flue gas. *Id.*

In 1995, OPC installed wet scrubbers on both units. *Id.* at 4. The wet scrubbers were designed to remove sulfur dioxide, another byproduct of combustion, from the flue gas. *Id.* The scrubbers also lowered the concentration of sulfur trioxide and sulfuric acid in the flue gas to a

---

[1] Neither party requested a *Daubert* hearing or made *Daubert*-type objections. However, consistent with the Court's gatekeeping duty, the Court has conducted a preliminary review of all of the expert reports submitted in connection with the motions for summary judgment and holds that those reports are relevant and reliable for purposes of ruling on those motions. *See Greenwell v. Boatright,* 184 F.3d 492, 498 (6th Cir. 1999) ("Although the trial court is not required to hold an actual hearing to comply with *Daubert,* the court is required to make an initial assessment of the relevance and reliability of the expert testimony.").

range of 18 to 21 parts per million ("ppm"). *Id.* at 5.

Six years later, in response to changing environmental laws, OPC installed selective catalytic reactors ("SCRs") in both units. *Id.* at 5. The purpose of the installation was to remove nitrogen oxides from the flue gas streams. *Id.* The SCRs only operate during the "Ozone Season," which is from May 1 to September 30 each year. Although the SCRs did remove nitrogen oxides from the flue gas, the SCRs had a separate, undesired effect–namely, the increased conversion of sulfur dioxide to sulfur trioxide in the flue gas. *Id.* at 6. The increased concentration of sulfur trioxide caused the flue gas to exhibit a blue hue. *Id.*

After the SCRs were installed, CAP members and OPC employees noticed that the blue flue gas took the shape of a plume and appeared to touch down on the land around the Gavin Plant on numerous occasions. (P. Stinson Dec. at ¶ 4; Durner Dep. 190-91; Lytle Dep. 160-61; Osborne Dep. 352-53; Durner Rep. at 6). CAP members experienced watery eyes, burning throats, headaches, and breathing problems during plume touchdowns. (P. Stinson Dec. at ¶ 4; A. Stinson Dec. at ¶ 4 and p. 9).

OPC took measures to correct the situation, including, *inter alia*, implementing air testing and entering into an Memorandum of Agreement with the United States Environmental Protection Agency and the Ohio Environmental Protection Agency. Current concentrations of sulfur trioxide and sulfuric acid within the flue gas are lower than they were before the SCRs were installed. (Durner Rep. at Appendices C, E, and F).

CAP instituted this action on May 12, 2004. CAP's Amended Complaint alleges that OPC has violated the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B); the Comprehensive Environmental Response, Compensation, and Liability Act

3

("CERCLA"), 42 U.S.C. § 9659(d)(1); and the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11046(d)(1). (Doc. # 14). OPC filed an Answer denying all of CAP's allegations, and now moves for summary judgment on CAP's RCRA claim. (Doc. # # 16, 51). The motion is fully briefed, and the Court now turns to an examination of the arguments contained within those briefings.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52). However, in ruling on a motion for summary judgment, "a district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

## DISCUSSION

OPC maintains that judgment in its favor is warranted on CAP's RCRA claim because: (1) airborne emissions from the Gavin Plant are not "solid or hazardous waste" as defined under the RCRA; and (2) CAP fails to show that the material emitted from the Gavin Plant may present an imminent or substantial endangerment to public health. (Doc. # 51 at 1). OPC's former argument contains two parts. First, OPC argues that the flue gas is not a solid waste because it is not disposed of onto or on land. (Doc. # 51 at 9-10). Alternatively, OPC asserts that the flue gas is not a solid waste because the flue gas is not a liquid, solid, semisolid or contained gaseous material. *Id.* at 12-13; Doc. # 76 at 5-6. CAP responds to OPC's multiple-prong attack by contending that the material emitted from the Gavin Plant's stacks is, indeed, a solid waste under the RCRA and that the flue gas does pose an imminent and substantial threat to the health of CAP members and other Cheshire residents. (Doc. # 64 at 1). The Court finds CAP's arguments to be more convincing.

**I.      RCRA Framework**

The RCRA "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Safe Air v. Meyer*, 373 F.3d 1035, 1040-41 (9th Cir. 2004) (quoting *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996)). "Congress'

5

'overriding concern' in enacting RCRA was to establish the framework for a national system to insure the safe management of hazardous waste." *Meyer*, 373 F.3d at 1041 (quoting *Am. Mining Cong. v. EPA*, 824 F.2d 1177, 1179 (D.C. Cir. 1987)). Congress also expressed concern over "the 'rising tide' in scrap, discarded, and waste materials" and "the need to reduce the amount of waste and unsalvageable materials and to provide for proper and economical solid waste disposal practices." *Id.* (quoting 42 U.S.C. § 6901(a)(2) and (a)(4)).

CAP asserts its RCRA claim pursuant to the Act's citizen suit provision. That provision provides that citizens may commence a suit against any "person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."[2] 42 U.S.C. § 6903(15). Only injunctive relief is available under the citizen suit portion of the RCRA. *Meghrig*, 516 U.S. at 489.

## II. The Flue Gas is "Solid Waste".

In order to prevail on its RCRA claim, CAP must establish that the Gavin Plant is contributing to the "handling, storage, treatment, transportation, or disposal of any *solid or hazardous waste* which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B) (emphasis added). CAP does not allege that the emissions from the Gavin Plant qualify as hazardous waste.[3] (Doc. # 64 at 10-13). Therefore, the crux of the instant motion turns on whether the Gavin Plant's emissions qualify as solid

---

[2] CAP only argues the health aspect of the provision. (Doc. # 64 at 16). Also, OPC admits that it fits the statute's definition of "person." (Doc. # 16 at ¶ 22).

[3] CAP need not make that argument because hazardous wastes are a subset of solid wastes. *Meyer*, 373 F.3d at 1043 n.7.

6

waste within the meaning of the RCRA.

The Court's efforts at interpreting the RCRA are guided by canons of statutory construction. The first applicable canon mandates that the Court begin with the language of the statute itself. *Walker v. Bain*, 257 F.3d 660, 666 (6th Cir. 2001). If the Court can discern an unambiguous and plain meaning from the language of the statute, then the Court must enforce the statute according to its clear terms. *Hadix v. Johnson*, 398 F.3d 863, 866 (6th Cir. 2005). Additionally, "in construing a statute, courts generally give words not defined in a statute their 'ordinary or natural meaning.'" *United States v. Alvarez-Sanchez*, 511 U.S. 350, 357 (1994). Furthermore, because the RCRA is a remedial measure, courts have tended to construe it in "a liberal, though not unbridled, manner." *Davis v. Sun Oil Co.*, 148 F.3d 606, 609 (6th Cir. 1998). With these maxims in mind, the Court turns again to the RCRA.

The RCRA defines "solid waste" as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations...." 42 U.S.C. § 6903(27).[4] The Gavin Plant is not a waste or water treatment plant and it is not an air pollution control facility. However, OPC, as the owner and operator of the Gavin Plant, is undoubtedly engaged in industrial operations. The question thus becomes whether the flue gas emissions from the Gavin Plant are "discarded material, including ... liquid, semisolid, or contained gaseous material resulting from industrial, commercial ... operations...."

---

[4] The Court will discuss whether the flue gases constitute "solid, liquid, semisolid, or contained gaseous material" *infra*. (Doc. # 51 at 12-13; Doc. # 64 at 2-4, 10-11).

7

The RCRA itself does not define the term "discarded material." *Meyer*, 373 F.3d at 1041. However, the verb "discard" is defined by dictionary and usage to mean to "cast aside; reject; abandon; give up." 1 The New Shorter Oxford English Dictionary 684 (4th ed. 1993). Indeed, the Federal Register defines "discarded material" as "abandoned," "recycled," or "inherently wastelike." 40 C.F.R. § 261.2. Neither party asserts that the flue gas emissions are recycled or that such emissions qualify as inherently wastelike.[5] (Doc. # # 51, 64, 76). The

---

[5] The Federal Register describes "inherently wastelike" as:

> The following materials are solid wastes when they are recycled in any manner:
>
> (1) Hazardous Waste Nos. F020, F021 (unless used as an ingredient to make a product at the site of generation), F022, F023, F026, and F028.
>
> (2) Secondary materials fed to a halogen acid furnace that exhibit a characteristic of a hazardous waste or are listed as a hazardous waste as defined in subparts C or D of this part, except for brominated material that meets the following criteria:
>
> (i) The material must contain a bromine concentration of at least 45%; and
>
> (ii) The material must contain less than a total of 1% of toxic organic compounds listed in appendix VIII; and
>
> (iii) The material is processed continually on-site in the halogen acid furnace via direct conveyance (hard piping).
>
> (3) The Administrator will use the following criteria to add wastes to that list:
>
> (i)(A) The materials are ordinarily disposed of, burned, or incinerated; or
>
> (B) The materials contain toxic constituents listed in appendix VIII of part 261 and these constituents are not ordinarily found in raw materials or products for which the materials substitute (or are found in raw materials or products in smaller concentrations) and are not used or reused during the recycling process; and
>
> (ii) The material may pose a substantial hazard to human health and the environment when recycled.

40 C.F.R. § 261.2(d).

Court therefore focuses on whether the flue gas emissions are "abandoned."

"Abandoned" is defined in the Federal Register to include materials that are "disposed of, or burned or incinerated, or accumulated, stored or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned, or incinerated." 40 C.F.R. § 261.2(b). (Doc. # 51 at 9-10; Doc. # 64 at 10). The parties argue, and the Court agrees, that only the "disposed of" prong of the definition is at issue here. *Id.*

### A. The flue gas is discharged "into or on any land".

The definitional hierarchy continues. The RCRA defines "disposal" as the "discharge, ... or placing of any solid waste or hazardous waste *into or on any land* or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3) (emphasis added). OPC posits that the flue gas emissions are not solid waste because the stacks emit the flue gas into the air, not "into or on any land or water."[6] (Doc. # 51 at 10; Doc. # 76 at 2-4). In contrast, CAP, while admitting that the Gavin Plant emits the flue gases into the air via the 830-foot stacks, argues that the "into or on any land" requirement is satisfied when the blue plumes touch the ground. (Doc. # 64 at 11). So, the Court must discern whether the stacks' emission of the flue gases into the air that occasionally results in plume touchdowns on the land constitutes disposal within the meaning ascribed to that term by the RCRA.

The former portion of the statute's definition of disposal that requires the discharge of solid waste "into the land" essentially requires CAP to produce evidence that at least a trace

---

[6] CAP's argument focuses on air and omits water.

amount of the flue gases are, or were, present in any land in and around the Gavin Plant. CAP has not produced a single piece of evidence to that end. And, in the absence of such evidence, the Court cannot hold that the flue gases actually permeated the ground, as the word "into" inherently requires.

However, the latter portion of the definition states that disposal may be the "discharge ... or placing of any solid waste or hazardous waste ... on any land...." Regarding that part of the definition, Paul Stinson states in his declaration that he has frequently seen "blue plumes" *touch on the ground* near his home on numerous occasions. (P. Stinson Dec. ¶ 4). OPC officials, also testified that they saw the blue plumes touch down on the ground. (Durner Dep. 190-91; Lytle 160-61; Osborne Dep. 352-53; Durner Rep. at 6). Consequently, evidence in the record supports a finding that the flue gas is discharged or placed on land. OPC's argument that the flue gas is not "discarded material" is therefore unavailing. (Doc. # 51 at 9).

### B. OPC's alternative solid waste argument is irrelevant.

Alternatively, OPC asserts that the flue gas is not a solid waste because it is not a "liquid, solid, semisolid or contained gaseous material" for purposes of the RCRA. *Id.* at 12. CAP argues that the flue gas qualifies as a liquid because it is an "aerosol mist." (Doc. # 64 at 11).

Both arguments miss the mark. As previously noted, the RCRA is a remedial statute that is to be interpreted broadly. *Davis*, 148 F.3d at 609. Keeping that principle in mind, the definition of solid waste encompasses "other *discarded material, including solid, liquid, semisolid, or contained gaseous material* resulting from industrial, commercial, mining, and agricultural operations...." (Emphasis Added). The Court held above that the flue gas was discarded material resulting from industrial operations within the meaning of the RCRA; thus,

10

the Court essentially held that the flue gases were solid waste within the meaning of the Act. The Court need not additionally determine whether the flue gas is a " liquid, solid, semisolid, or contained gaseous material" because, interpreting the provision liberally, the reference to those materials in regards to discarded material is merely illustrative, not comprehensive. Accordingly, the Court need not and shall not determine whether the flue gas is a "liquid" under the RCRA.

### III.     Imminent and Substantial Harm

OPC also asserts that CAP has failed to establish that the emissions of the flue gases present and imminent and substantial threat of harm to the health of CAP members and Cheshire residents. (Doc. # 51 at 13-18; Doc. # 76 at 6-11). CAP correctly retorts that the existence of a genuine issue of material fact prevents the Court from granting judgment in OPC's favor. (Doc. # 64 at 13-18).

Once again, the Court returns to the language of the statute. The RCRA's citizen suit provision states that CAP may commence a suit against any "person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which *may present an imminent and substantial endangerment to health or the environment.*"[7] 42 U.S.C. § 6903(15) (emphasis added). The language is expansive and "is intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any* risk posed by toxic wastes." *Davis*, 148 F.3d at 609 (emphasis in original).

---

[7] CAP only argues the health aspect of the provision. (Doc. # 64 at 16).

The "imminent and substantial" wording "implies that there must be a threat which is present now, although the impact of the threat may not be felt until later." *Meghrig*, 516 U.S. at 486. Furthermore, the "reference to waste which 'may present' imminent harm quite clearly excludes waste that no longer presents such a danger." *Id.* at 485-86. In addition, "substantial" requires a "reasonable cause for concern that someone or something may be exposed to a risk of harm . . . if remedial action is not taken." *United States v. Conservation Chemical Co.*, 619 F. Supp. 162, 193 (W.D. Mo. 1985). Lastly, "endangerment" means a threatened or potential harm and does *not* require proof of actual harm. *Dague v. City of Burlington*, 935 F.2d 1343, 1356 (2nd Cir. 1991) (emphasis added).

OPC asserts that there is no such present threat to the health of CAP's members because the levels of sulfur trioxide and sulfuric acid in the flue gas are lower now than they were before the SCRs were installed on the units at the Gavin Plant. (Doc. # 51 at 17; Doc. # 76 at 7-10). However, April Stinson declared that she saw a blue plume touchdown on August 10, 2005 and that she experienced a burning sensation in her mouth, nose, and lungs and that she got a headache during that touchdown. (A. Stinson Dec. p. 10). That would indicate that at least for that incident the levels of those chemicals in the flue gas were higher than the normal post-SCR levels.

CAP's expert, Stewart Batterman, Ph.D ("Batterman"), indicated that the symptoms the Stinsons complained of were consistent with exposure to sulfuric acid. (Batterman Dec. ¶¶ 20, 21, 26). Batterman also noted that "unless mitigating measures are taken ... emissions at the Gavin facility will continue to represent an imminent and substantial endangerment to public health." *Id.* at ¶ 27. In contrast, OPC's expert Valberg concluded that those individuals who

were exposed to a plume touchdown might suffer from "some transient and reversible physiological effects." (Valberg Rep. 1). This disagreement among the experts retained by the parties creates a genuine issue of material fact as to whether the flue gas emissions may present an imminent and substantial endangerment to the health of CAP members. *See Davis*, 148 F.3d at 609. As such, the Court **DENIES** OPC's motion for summary judgment on CAP's RCRA claim. (Doc. # 51).

    **IT IS SO ORDERED.**


        s/ Gregory L. Frost

    **GREGORY L. FROST**
    **UNITED STATES DISTRICT JUDGE**