## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**CITIZENS AGAINST POLLUTION,**

        **Plaintiff,**                  **Case No. C2-04-CV-371**
                                          **JUDGE GREGORY L. FROST**
      **v.**                           **Magistrate Judge Abel**

**OHIO POWER COMPANY,**

        **Defendant.**

### OPINION & ORDER FILED UNDER SEAL

Currently before the Court are cross motions for summary judgment on counts two and three of Plaintiff Citizens Against Pollution's ("CAP") Amended Complaint. (Doc. # 52, 61). The motions are now ripe. (Doc. # # 62, 65, 74, 77). For the reasons that follow, the Court **DENIES** both motions. (Doc. # # 52, 61).

### BACKGROUND

CAP is a non-profit Ohio corporation whose purpose is, *inter alia*, to "seek increased awareness of pollution sources in Cheshire, Ohio." (Doc. # 14 at ¶ 6). It boasts eighty-two (82) members, all of whom reside in or near Cheshire. Defendant Ohio Power Company ("OPC") is a wholly-owned subsidiary of American Electric Power, Inc. (Doc. # 16 at ¶ 9). OPC is the owner and operator of the General James M. Gavin Power Plant ("Gavin Plant") in Cheshire, Ohio. (Doc. # 52 at 2).

The Gavin Plant is a coal-burning facility. *Id.* It has two electric generating units and two 830 foot stacks. (Doc. # 16 at ¶ 9). Sulfur trioxide and sulfuric acid are byproducts of coal

combustion. (Michael Durner Report at 3).[1]  Both sulfur trioxide and sulfuric acid pass through various equipment before exiting the stack as part of a flue gas.  *Id.*  The equipment removes some, but not all, of the sulfur trioxide and sulfuric acid from the flue gas.  *Id.*

In 1995, OPC installed wet scrubbers on both units.  *Id.* at 4.  The wet scrubbers were designed to remove sulfur dioxide, another byproduct of combustion, from the flue gas.  *Id.*  The scrubbers also lowered the concentration of sulfur trioxide and sulfuric acid in the flue gas to a range of 18 to 21 parts per million ("ppm").  *Id.* at 5.

Six years later, in response to changing environmental laws, OPC installed selective catalytic reactors ("SCRs") in both units on May 1, 2001.  *Id.* at 5; *see also* Doc. # 53 at ¶ ¶ 4-5. The purpose of the installation was to remove nitrogen oxides from the flue gas streams. (Michael Durner Report at 5).  The SCRs only operate during the "Ozone Season," which is from May 1 to September 30 of each year.  Although the SCRs did remove nitrogen oxides from the flue gas, the SCRs had a separate, undesired effect–namely, the increased conversion of sulfur dioxide to sulfur trioxide in the flue gas.  *Id.* at 6.  In turn, the amount of sulfuric acid in the flue gas increased as well.  The increased concentration of sulfur trioxide and sulfuric acid caused the flue gas to exhibit a blue hue.  *Id.*

After the SCRs were installed, CAP members and OPC employees noticed that the blue

---

[1] Neither party requested a *Daubert* hearing or made *Daubert*-type objections.  However, consistent with the Court's gate-keeping duty, the Court has conducted a preliminary review of all of the expert reports submitted in connection with the motions for summary judgment and holds that those reports are relevant and reliable for purposes of ruling on those motions.  *See Greenwell v. Boatright,* 184 F.3d 492, 498 (6th Cir. 1999) ("Although the trial court is not required to hold an actual hearing to comply with *Daubert,* the court is required to make an initial assessment of the relevance and reliability of the expert testimony.").

flue gas took the shape of a plume and touched down on the land around the Gavin Plant on numerous occasions. (P. Stinson Dec. at ¶ 4; Durner Dep. 190-91; Lytle Dep. 160-61; Osborne Dep. 352-53; Durner Rep. at 6). CAP members experienced watery eyes, burning throats, headaches, and breathing problems during plume touchdowns. (P. Stinson Dec. at ¶ 4; A. Stinson Dec. at ¶ 4 and p. 9).

OPC took measures to correct the situation, including, *inter alia*, implementing air testing and entering into a Memorandum of Agreement with the United States Environmental Protection Agency ("USEPA") and the Ohio Environmental Protection Agency ("OEPA"). From 2002 to the present, concentrations of sulfur trioxide and sulfuric acid within the flue gas were lower than they were before the SCRs were installed. (Durner Rep. at Appendices C, E, and F).

CAP instituted this action on May 12, 2004. CAP's Amended Complaint alleges that OPC has violated the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B); the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9659(d)(1); and the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11046(d)(1). (Doc. # 14). OPC filed an Answer denying all of CAP's allegations, and now OPC and CAP move for summary judgment on CAP's first CERCLA claim and its only EPCRA claim. (Doc. # # 16, 52, 61).[2] The motion is fully briefed, and the Court now turns to an examination of the arguments contained within those briefings.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

---

[2] CAP moves for summary judgment only on the issue of liability, not relief. (Doc. # 61 at 1).

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52). However, in ruling on a motion for summary judgment, "a district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

## DISCUSSION

In brief, OPC asserts that summary judgment in its favor is warranted because it satisfied

the notice and reporting requirements of CERCLA and EPCRA.  (Doc. # 52 at 1).  Of course,

CAP maintains that the Court should enter judgment in its favor on those two claims because no

genuine issue of material fact exists regarding OPC's failure to met those statutory mandates.

(Doc. # 61).  A brief overview of each statute is necessary before the Court turns to deciphering

which argument, if any, has merit.

I.      **CERCLA**

CERCLA is a remedial statute designed to protect human health and the environment

from potentially hazardous substances.  *Sierra Club, Inc. v. Tyson Foods, Inc*., 299 F. Supp. 2d

693, 710 (W.D. Ky. 2003).  The purpose of Section 103, the basis for CAP's CERCLA claim at

issue, is "to alert the appropriate government officials to releases of hazardous substances that

may require rapid response to protect public health and welfare and the environment."  50 Fed.

Reg. 13,456 (April 4, 1985).  The remedial statute therefore demands liberal, albeit not

unbridled, interpretation.  *See United States v. Bestfoods*, 524 U.S. 51, 55 (1998).

CERCLA authorizes any person to "commence a civil action on his own behalf . . .

against any person . . . . who is alleged to be in violation of any standard, regulation, condition,

requirement, or order which has become effective pursuant to this chapter . . . ." 42 U.S.C. §

9659(a)(1).  CAP's current CERCLA claim is premised upon section 103(a) of the Act.  (Doc. #

14 at ¶ ¶ 26-36).  That section provides "[a]ny person in charge of . . . an onshore facility shall,

as soon as he has knowledge of any release (other than a federally permitted release) of a

hazardous substance from such . . . facility in quantities equal to or greater than those determined

pursuant to section 9602 of this title, immediately notify the National Response Center...."  42

U.S.C. § 9603(a).

OPC does not contest that it falls within the definition of "facility."[3]  (Doc. # 52 at 6).

Furthermore, sulfuric acid constitutes a hazardous substance under CERCLA.  40 C.F.R. §

302.4.  Sulfuric acid has a threshold reporting requirement of 1,000 pounds.  *Id.*

## II.    EPCRA

The Supreme Court noted "EPCRA establishes a framework of state, regional and local

agencies designed to inform the public about the presence of hazardous and toxic chemicals, and

to provide for emergency response in the event of health-threatening releases."  *Steel Co. v.*

*Citizens for a Better Environment*, 523 U.S. 83, 86 (1998).  To that end, under the EPCRA, an

owner or operator of a facility must report to state and local emergency planning committees the

release of a hazardous substance.  42 U.S.C. § 11004(a)(1), (3).  Specifically, the EPCRA

provides that "if a release of an extremely hazardous substance ... occurs from a facility at which

a hazardous chemical is produced, used, or stored, and such release requires notification under

section 103(a) [of CERCLA], the owner or operator of the facility shall immediately provide

notice as described in subsection (b) of this section."  42 U.S.C. § 11004(a)(1).  Subsection (b)

orders that notice be provided by telephone to community emergency planning committees, if

_____

[3] CERCLA defines "facility" as follows:

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).  This Court has concluded "usually, although perhaps not always, the definition of facility will be the entire site or area, including single or contiguous properties, where hazardous wastes have been deposited as part of the same operation or management." *Cytec Indus. v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821, 836 (S.D. Ohio 2002).

they exist, and to the State emergency planning commission of any State likely to be affected by the release.  42 U.S.C. § 11004(b).  A follow-up notice is then required as soon as possible after a release occurs.  42 U.S.C. § 11004(c).

CAP brings its EPCRA claim pursuant to the statute's citizen-suit provision, 42 U.S.C. § 11046(a)(1), which authorizes civil penalties and injunctive relief against "an owner or operator of a facility for failure," among other things, to "submit a followup emergency notice."  *Tyson Foods, Inc.*, 299 F. Supp. 2d at 701 (citing Section 304(c) of EPCRA, 42 U.S.C. § 11046(a)(1)(A)(i)).

OPC admits that it is a facility under the EPCRA.[4]  (Doc. # 52 at 7).  OPC owns and operates the Gavin Plant.  In addition, sulfuric acid is an extremely hazardous substance as that term is defined in the statute.  40 C.F.R.  Part 355.  Sulfuric acid has a threshold reporting requirement of 1,000 pounds.  *Id.* at App. A.

## III.    CONTINUOUS RELEASE RULE

As noted above, under CERCLA and EPCRA, OPC must file a report with the appropriate agencies whenever the Gavin Plant emits more than 1,000 pounds of sulfuric acid. *See* 42 U.S.C. § 9603(a); 42 U.S.C. § 11004(a)(1), (b).  However, Congress created a reporting exemption to those requirements in 42 U.S.C. § 9603(f)(3) ("Section 103(f)").[5]  Referred to as the "Continuous Release Rule" ("CRR"), Section 103(f) effectively eliminates duplicative

---

[4] The EPCRA defines "facility" as "all  buildings, equipment, structures, and other stationary items which are located on a single site or on contiguous or adjacent sites and which are owned or operated by the same person (or by any person which controls, is controlled by, or under common control with, such person). For purposes of section 11004 of this title, the term includes motor vehicles, rolling stock, and aircraft." 40 C.F.R. § 355.20.

[5] The statute's implementing regulations may be found in 40 C.F.R. Parts 302 and 355.

release notifications.  When the United States Environmental Protection Agency ("USEPA")

adopted the CRR, it noted:

> Federal officials should not have to be notified each time the release occurs to decide whether a response is needed.  Thus, instead of reporting every release that equals or exceeds the reportable quantity ["RQ"] as it occurs, the person in charge of a ... facility is allowed to report less often for continuous and stable releases.

55 Fed. Reg. 30166, 30168 (July 2, 1990).

To effect that purpose, § 103(f)(2) provides:

> f) Exemptions from notice and penalty provisions for substances reported under other Federal law or in continuous release, etc. No notification shall be required under subsection (a) or (b) of this section for any release of a hazardous substance–...
> (2) which is a continuous release, stable in quantity and rate, and is ...
> (B) a release of which notification has been given under subsections (a) and (b) of this section for a period sufficient to establish the continuity, quantity, and regularity of such release:
> Provided, That notification in accordance with subsections (a) and (b) of this paragraph shall be given for releases subject to this paragraph annually, or at such time as there is any statistically significant increase in the quantity of any hazardous substance or constituent thereof released, above that previously reported or occurring.

42 U.S.C. § 9603(f)(2).  In order to qualify for reduced reporting under that section, the person in

charge must demonstrate a "sound technical basis" for claiming that a release is continuous

rather than episodic.  *Tyson Foods, Inc*., 299 F. Supp. 2d at 711-712 (citing 40 C.F.R. §

302.8(e)).  Specifically, the EPA stated:

> to qualify a release for reporting as a continuous release, you must establish a basis for asserting that the release is continuous and stable in quantity and rate. The Continuous Release Rule provides you with flexibility in establishing this basis. You may report the release ... on a per-occurrence basis for the period of time necessary to establish that the pattern of the release is continuous and stable.

> However, if you have a sufficient basis for establishing the continuity, quantity, and regularity of a release, multiple reports are not necessary. A one-time telephone call to each of the appropriate authorities ... will alert them to your intent to report the release as a continuous release.

EPA Guide, Reporting Requirements for Continuous Releases of Hazardous Substances at 5 (1997). Consequently, the EPA has provided that "if the person in charge does not have a basis supported by existing data, engineering estimates, operating history and experience, or professional judgment sufficient to qualify for reporting under section 103(f)(2), the release must be reported under section 103(a) for the length of time necessary to establish it as continuous and stable under the definition in today's rule." 55 Fed. Reg. 30166, 30172 n. 5 (July 24, 1990). Therefore, the person in charge must "qualify releases as continuous and stable" to benefit from the reduced reporting requirement of CERCLA § 103(f). If the person in charge fails to do so, any release equaling or exceeding the reportable quantity must be reported as an episodic release on a per-occurrence basis under CERCLA § 103(a). *See also* 55 Fed. Reg. 30166, 30174 (July 24, 1990).

Similarly, the regulations implementing the EPCRA provide that the reporting requirements do not apply to "any release of a hazardous substance that is, pursuant to the definitions in paragraph (b) of this section, continuous and stable in quantity and rate." 40 C.F.R. 302.8(a).[6] Accordingly, if OPC qualifies for the CRR under CERLA, it likewise qualifies

---

[6]     The following definitions apply to notification of continuous releases:

> Continuous. A continuous release is a release that occurs without interruption or abatement or that is routine, anticipated, and intermittent and incidental to normal operations or treatment processes.

> Normal range. The normal range of a release is all releases (in pounds or

for the CRR under EPCRA.  55 Fed. Reg. 30166 (July 24, 1990) (stating "Relief from reporting

under section 103 also applies to notification required under [EPCRA]").

> **A.    Are the Gavin Plant's sulfuric acid emissions continuous?**

The first requirement that OPC must satisfy in order to qualify for the CRR is that the

flue gas emissions of sulfuric acid are continuous. OPC argues that they are; CAP argues that

they are not.  (Doc. # 52 at 10; Doc. # 61 at 27-28; Doc. # 65 at 2-4).

A continuous release "is a release that occurs without interruption or abatement or that is

routine, anticipated, and intermittent and incidental to normal operations or treatment processes."

40 C.F.R. § 302.8(b).  OPC asserts that the latter half of the definition applies.   (Doc. # 52 at 10-

12).  Thus, its emissions are "routine, anticipated, and intermittent and incidental to normal

operations or treatment processes" when they "have a high degree of regularity and predictability

associated with them" and are not episodic or the results of accidents, emergency shutdowns, or

---

kilograms) of a hazardous substance reported or occurring over any 24-hour
period under normal operating conditions during the preceding year. Only
releases that are both continuous and stable in quantity and rate may be included
in the normal range.

Routine. A routine release is a release that occurs during normal operating
procedures or processes.

Stable in quantity and rate. A release that is stable in quantity and rate is a release
that is predictable and regular in amount and rate of emission.

Statistically significant increase. A statistically significant increase in a release is
an increase in the quantity of the hazardous substance released above the upper
bound of the reported normal range of the release.

40 C.F.R. § 302.8(b).

ruptures.  55 Feg. Reg. at 30169-70 (July 24, 1990).  A release need not occur at the same time to be predictable; instead, a release may be predictable with respect to timing if it occurs "in association with an anticipated event."  *Id.*

OPC argues that the sulfuric acid portion of the flue gas is both regular and predictable because it is a natural byproduct of coal combustion.  (Doc. # 52 at 11; Novotny Dep. 47-48, 97).  In contrast, CAP asserts that the sulfuric acid emissions within the flue gas are episodic and variable because OPC had to hire a "high level task force of experts" to decipher what was causing the increased levels of sulfuric acids after the SCRs were installed. (Doc. # 65 at 3-4).

CAP's argument misses the mark.  The fact that OPC hired experts has nothing to do with whether the Gavin Plant's emissions of sulfuric acid in the flue gasses were routine, anticipated, and intermittent and incidental to normal operations or treatment processes.  In brief, as CAP admits, as long as the Gavin Plant is a coal-burning facility, it will regularly produce sulfuric acid as part of its flue gas–the production of sulfuric acid is therefore incidental to normal operations at the plant.  (Doc. # 14 at ¶¶ 9, 11-12).  Thus, the Gavin Plant's emissions of sulfuric acid as part of the flue gas emissions are not episodic but instead are continuous under the CERCLA and EPCRA.  The Court holds that OPC had a sound technical basis for concluding that the emissions of sulfuric acid within the flue gas were continuous.

**B.      Are the Gavin Plant's Emissions of Sulfuric Acid as Part of the Flue Gas Stable in Quantity and Rate?**

Releases are stable in quantity and rate when they are "predictable and regular in amount and rate of emission."  40 C.F.R. § 302.8(b); 55 Fed. Reg. 30166 (July 24, 1990). The EPA adopted a "qualitative approach" when it passed the rule, and therefore releases "need not be

11

uniform in quantity and rate of emission in order to be considered stable." 55 Fed. Reg. 30166,

30171 (July 24, 1990).  The USEPA explained:

> So long as the person in charge has a sufficient basis for establishing the
> continuity and stability of a release, multiple reports over a period of time are not
> necessary. The person in charge may rely on release data, engineering estimates,
> knowledge of the plant's operations and release history, and professional
> judgment to establish the basis for reporting under section 103(f)(2).

*Id.*  The USEPA further noted:

> to comply with the requirements of today's rule, persons in charge may use
> readily available information. EPA does not expect a facility or vessel to perform
> additional monitoring in order to comply with today's rule. Neither the
> identification of SSIs nor the other reporting requirements in today's final rule
> necessitates monitoring or measuring of releases to acquire empirical data. EPA
> has limited the information required in the initial and follow-up reports to data
> that can be calculated or estimated. For example, the Agency has eliminated the
> proposed requirements that the person in charge report the number of times the
> amount of the release during any 24-hour period exceeded the RQ, the mean
> release, and the single largest release.

> Although no monitoring or measuring of releases is required, estimates provided
> in the reports, such as the total annual amount of the release and the normal range,
> must have a *sound technical basis* .... For example, in the case of a facility with a
> coal-fired boiler, the person in charge can estimate the hazardous substance
> releases from the boiler by considering such factors as the hazardous constituents
> in the particular type(s) of coal used, the volume of coal used, the efficiency of
> the boiler, and the amount of energy produced.

55 Fed. Reg. 30166, 30174 (July 24, 1990) (emphasis added).  The parties diverge on the issue

of whether OPC had a sound technical basis for its conclusion that the sulfuric acid emissions in

the flue gas were stable in quantity and rate.  OPC maintains that it did; CAP asserts that OPC

did not.  (Doc. # 52 at 12-15; Doc. # 61 at 11-14; Doc. # 62 at 12-14; Doc. # 65 at 4-8; Doc. # 74

at 5-8; Doc. # 77 at 10-11).

Duane Phlegar ("Phlegar"), the Gavin Plant's general manager, contacted the appropriate

12

authorities by telephone on March 13, 2000 and stated that the Gavin Plant's sulfuric acid emissions as part of its flue gas qualified for a reporting exemption under the CRR.  (Doc. # 52 Ex. D).[7]  His attached report stated that the Gavin Plant's range for reported releases of sulfuric acid aerosol was from zero to 8,913 pounds within a twenty-four (24) hour period.  *Id.*  Phlegar indicated that his report was based upon past release data, knowledge of the plant's operations and release history, his best professional judgment, and an engineering estimate.  *Id.*

Phleger then filed the requisite one-year follow up notification with the USEPA on May 2, 2001.  (Doc. # 52 Ex. E).[8]  That notification increased the upper-bound reported range for continuous sulfuric acid aerosol releases to 10,969 pounds within a twenty-four (24) hour period. *Id.*  OPC did not consider the potential impact the SCRs might have on the sulfuric acid emissions when it was deciding upon the new upper-bound.  (Novotny Dep. 63-64).

Approximately two months later, on July 6, 2001, OPC notified the appropriate authorities via telephone of a statistically significant increase in sulfuric acid emission within the flue gas.  (Doc.# 61 Pl. Ex. 59; *see also* Doc. # 53 at ¶ 9). On August 2, 2001, Matthew Curtis, an AEP environmental services employee, sent a letter to the USEPA informing the agency of a statistically significant increase in the Gavin Plant's continuous release of sulfuric acid within the flue gas.  *Id.*  The letter stated that the new normal range for the release of sulfuric acid was zero to 64,213 pounds within a twenty-four (24) hour period.  *Id.*  The letter also stated that "the upper values of this range are only expected to be reached during the five-month ozone season

---

[7] The document appears to satisfy the business record exception to the hearsay rule.  *See also* Doc. # 53 at ¶ 9 (referring to Ex. A).

[8] *See* Doc. # 53 at ¶ 9 (referring to Ex. A).

when pollution control technology is in use." *Id.*  Curtis continued by noting:

> The change in range for release of sulfuric acid was calculated based on test data collected after the recent installation and commencement of operation of [SCRs] at the facility .... The SCR[s] will be operated only during the ozone season.  During the balance of the year, releases will be similar to the previously reported range and will be well within the upper bound of the new range for ozone season operations.
>
> The sulfuric acid aerosol release is routine, anticipated, intermittent and incidental to normal operations.  Based on these characteristics, it is eligible for continuous release reporting.  Actual releases will vary with seasonal operation of the SCR, actual hours of operation, fuel quality and other factors, but the release quantity will remain within the newly established range (0 to 64,213 pounds).

*Id.*

The arguments of the parties may be summarized as follows:  CAP notes that the SCRs began operating on May 1, 2001.  One day later, OPC sent the USEPA an annual notification that increased the upper bound of sulfuric acid releases.  In July 2001, OPC notified the USEPA of the statistically significant increase in the Gavin Plant's sulfuric acid emissions.  One month later, OPC notified the USEPA that the new normal range for the release of sulfuric acid was zero to 64,213 pounds. Given the short time frame, CAP asserts that OPC did not have "sufficient information or operating experience" to satisfy the statutes' requirements that the continuous release notifications be "'for a period sufficient to establish the continuity, quantity and regularity of such release.'"  (Doc.# 61 at 14 (quoting 42 U.S.C. § 9603(f)(2)).  In contrast, OPC maintains that it relied on USEPA factors to determine whether the continuous release of sulfuric acid was stable in quantity and rate.  (Doc. # 77 at 10 (citing Novotny Dep. 39-45)).[9]

---

[9] OPC contradicts itself in its reply brief when its states "the Southern Company Method is not used in the development of continuous release data."  (Doc. # 77 at 10; *see also* Doc. # 52 at 15).

The issue is therefore framed in the following manner: did OPC have a sound technical basis for concluding that the Gavin Plant's emissions of sulfuric acid within the flue gas were stable in quantity and rate on August 2, 2001?

Jeffrey Novotny ("Novotny"), an AEP engineer, helped prepare the continuous release and statistically significant increase reports that were filed with the USEPA.   (Novotny Dep. 16, 36, 40-41, 45, 63, 85-86).  His testimony was less than clear as to what factors he used regarding the revised upper bound level of 64,213 pounds.  Initially, Novotny testified that the 64,213 number was based upon testing of emissions from one stack during a one and one-half hour period on June 30, 2001.  *Id.* at 65, 73, 79, 106.  On that day, no mitigation system was running, although OPC anticipated implementing such a system in the near future.  *Id.* at 62-63, 73.  Later, however, Novotny stated that the figure was the result of several types of unspecified analysis.  The following portion of Novotny's deposition illustrates the Court's confusion as to what Novotny considered:

> Q: Did you have any data at the time from which you could conclude that this number, releases at this number 64,213 were going to be continuous and stable?
>
> A: The number–the operation of the unit was going to be continuous and stable.  My recollection of *when all these analysis were being performed* was, that numbers would vary day by day.

*Id.* at 74-75 (emphasis added).

Because the Court is unable to discern how or why Novotny decided upon the 64,213 figure, the Court cannot determine if OPC had a sound technical basis for concluding that the Gavin Plant's emissions of sulfuric acid within the flue gas were stable in quantity and rate.  The existence of this genuine issue of material fact mandates the **DENIAL** of both motions for

summary judgment on counts two and three of CAP's Amended Complaint. (Doc. # # 52, 61).

## CONCLUSION

The cross-motions for summary judgment on counts two and three of CAP's Amended Complaint are **DENIED**.  (Doc. # # 52, 61).

**IT IS SO ORDERED.**



   /s/   Gregory L. Frost          

**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**