**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION AT COLUMBUS**


| | | |
|---|---|---|
| **CITIZENS AGAINST POLLUTION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:04-CV-00371** |
| | ) | **Judge Gregory L. Frost** |
| **OHIO POWER COMPANY** | ) | **Magistrate Judge Mark R. Abel** |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**TRIAL BRIEF OF DEFENDANT OHIO POWER COMPANY**</u>

Pursuant to the Court's August 16, 2006, Order (Doc. No. 93), Defendant Ohio Power Company ("OPC") submits this Trial Brief on topics not yet briefed by the parties that OPC believes will assist the trial of this matter. Plaintiff Citizens Against Pollution ("CAP") has alleged three claims in its Amended Complaint: (1) that sulfuric acid emissions from the James M. Gavin Power Plant ("Gavin Plant") emitted after 2001 present an "imminent and substantial" endangerment to public health under 42 U.S.C. § 6972(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"); (2) that OPC has not properly reported emissions of sulfuric acid under 42 U.S.C. § 9659(a)(1) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); and (3) that OPC has not properly reported emissions of sulfuric acid under 42 U.S.C. §11046(a)(1) of the Emergency Planning and Community Right To Know Act. This matter is set for Trial beginning Monday, September 18, 2006.

**I.     The Sulfuric Acid Emitted from OPC's Gavin Plant Do Not Threaten an "Imminent and Substantial Endangerment to Health or the Environment."**

Even if this Court finds that the sulfuric acid emissions from the Gavin Plant are a "solid waste" and are "disposed" as defined in RCRA,[1] CAP also must establish that these emissions "may present an imminent and substantial endangerment to health or the environment."[2]  The "citizen suit" provisions of RCRA require CAP to prove that the threatened endangerment is: 1) imminent; and 2) a substantial endangerment to health or the environment.  CAP concedes that sulfuric acid emissions from the Gavin Plant have caused no damage to the environment.[3]  OPC will demonstrate that the sulfuric acid emissions from the Gavin Plant did not, at the time this action was filed, and do not now present an imminent or substantial endangerment to the health of area residents.

In order to carry its burden of proving the threat of harm is "imminent," CAP must prove that the harm from the emissions at the Gavin Plant "threaten to occur immediately."  <u>Meghrig et al., v. KFC Western, Inc</u>.[4]  The Supreme Court in <u>Meghrig</u>, in determining that plaintiffs' citizen suit under 42 U.S.C. §6972(a)(1)(B) did not present an imminent and substantial harm due to petroleum contamination, held that:

> " 'may present' imminent harm quite clearly excludes waste that no longer  presents [an immediate] danger…this language 'implies that there must be a threat which is present *now*, although the impact of the threat may not be felt until later.' "[5]

---

[1] Although the Court has made some preliminary findings on these issues, OPC respectfully incorporates by reference its prior filings on these issues.

[2] 42 U.S.C. §6972(a)(1)(B).

[3] <u>See</u> Opinion and Order on OPC's Mot. for Summ. J. on Pltf.'s RCRA Claim ("RCRA Opinion") at 11.

[4] 516 U.S. 479, 484 (1996).

[5] <u>Id</u>. at 486 <u>quoting</u> <u>Price v. United States Navy</u>, 39 F.3d 1011, 1019 (9th Cir. 1994) (emphasis original); 42. U.S.C. § 6902(b)); <u>see also</u> <u>Davis v. Sun Oil Company</u>, 148 F.3d 606 (6th Cir. 1998) (explicitly adopting the <u>Meghrig</u> holding in the Sixth Circuit).

CAP also must prove that the harm is "substantial."[6] In order to establish that the harm about which CAP complains is "substantial," there must be more than testimony that someone has been episodically exposed to low concentrations of sulfuric acid in ambient air. In order to be "substantial," CAP must prove that the endangerment is "serious." The endangerment "must be substantial or serious, and there must be some necessity for the action."[7] A substantial endangerment exists:

> where the specific circumstances of the disposal site presented such
> large and unmitigated hazards (such as the amount and type of waste, combined
> with its proximity to the public) that reasonable minds could not differ as to
> the import of the evidence.[8] Plaintiffs bear the burden to prove that the
> endangerment is substantial.[9]

OPC will offer the testimony of Dr. Peter Valberg, a recognized expert in the field of toxicology to demonstrate that, to the extent any CAP members could have been affected by the sulfuric acid concentrations measured in the ambient air in the vicinity of the Gavin Plant,[10] the impacts are not substantial. Dr. Valberg will explain that any impacts associated with such low-level and transient exposures are themselves transient and reversible, and not a greater risk than people face in virtually any community. OPC will provide corroborating expert testimony from Dr. Deborah Gray to establish that the ambient levels of sulfuric acid in the Cheshire area is

---

[6] 42 U.S.C. §6972(a)(1)(B).

[7] Price v. United States Navy, 39 F.3d 1011, 1019 (9th Cir. 1994).

[8] Meghrig, 516 U.S. at 479.

[9] Interfaith Comty.Org. v. Honeywell Int'l., Inc. 399 F.3d at 259 (internal citations and quotation marks omitted); see also Foster v. United States, 922 F. Supp. 642, 661 (D.D.C. 1996) ("Thus, any alleged endangerment 'must be substantial or serious, and there must be some necessity for the action." quoting Price v. U.S. Navy, 39 F.3d 1011, 1019 (9th Cir. 1994))

[10] As noted in the expert report of Deborah Gray, there are numerous sources of sulfuric acid emissions in the vicinity of the Gavin Plant, including other coal-fired electric generating facilities, and on-road and off-road vehicles, so it would be inaccurate to conclude that all detectible concentrations of sulfuric acid in the ambient air are attributable to emissions from the Gavin Plant.

simply too low to pose a significant health risk to the public.[11]  To the extent there is any endangerment facing CAP members, the risk posed by the exposure to emissions from the Gavin Plant is not substantial or serious.  Consequently, CAP's claim of an imminent and substantial endangerment fails.

The Supreme Court's language in the Meghrig case, cited above, identifies another factor that must be examined in determining whether CAP can establish the existence of an "imminent and substantial endangerment" – the measures OPC has undertaken to substantially abate its emissions.

In Smith v Potter, the court considered whether residual anthrax contamination at a mail-sorting facility in Manhattan posed an "imminent and substantial endangerment."  The court found that an imminent and substantial endangerment did not exist under the definition of 42 U.S.C. § 6972(a)(1)(B) because "…the risk of harm is remote in time, speculative in nature, de minimis in degree."[12]  In ruling that the endangerment was not imminent and substantial, the court specifically took note of the Postal Service's actions to address the source of contamination and mitigate the risks and the Centers for Disease Control's approval of the Service's activities.[13]

And, another court has found that "[a] vague possibility of future harm cannot satisfy the statute which applies to dangers which are both 'imminent and substantial.'"[14]  In Chemical

---

[11] None of the detectible concentrations in the vicinity of the Gavin Plant in 2001 exceeded the Occupational Health and Safety Administration's workplace exposure standards on a time-weighted average basis, and all of the values measured in 2002 were obtained over a very limited time frame of one hour or less.  No ambient samples or measurements have been taken since 2002, but substantial additional reductions in the sulfuric acid emissions from the Gavin Plant have been undertaken that would further reduce the Plant's contribution to any ambient concentrations.

[12] Smith v. Potter, 187 F.Supp. 2d 93, 98 (S.D.N.Y. 2001).

[13] Id.

[14] Chemical Weapons Working Group, Inc. v. United States Department of Defense, 2003 U.S. App. LEXIS 5359, *12 (10th Cir. 2003) (available upon request per Local Rule 7.2(b)(4)) (Chemical Weapons II).

Weapons II, plaintiffs brought suit under 42 U.S.C. §6972(a)(1)(B) against a Department of

Defense facility that destroyed decommissioned chemical weapons.  The court found  that

defendants had placed a significant number of safeguards around the facility to detect airborne

chemicals which might accidentally be released during the destruction process.  Of particular

note was the court's conclusion that plaintiffs could not maintain a claim under 42 U.S.C.

§6972(a)(1)(A) by alleging that some of the violations of RCRA had not yet occurred, or were

likely to recur:

> That is, in their second amended complaint, the appellant's alleged
> in general terms that violations were likely to occur in the future.  The appellants
> then waited until - as is all but inevitable in an imperfect world, and under the
> overlapping safety systems in place at [the facility] - an alarm went off, at which point
> they filed their third amended complaint.[15]

The court went on to find that the plaintiffs' claims were "an open-ended allegation that simply

does not satisfy the standards in RCRA."[16]  In Potter and Chemical Weapons II, the courts did

not to find that an imminent endangerment "may exist" despite the potential for individual

plaintiffs to be exposed to anthrax or chemical weapons.[17]

OPC will demonstrate at trial that sulfuric acid emissions from the Gavin Plant do not

pose any endangerment, and certainly none that is imminent or substantial.  The threat is not

imminent because the emissions that form the basis of CAP's Amended Complaint are the

unmitigated emissions associated with the start-up of the SCRs in 2001.  However, the evidence

to be adduced at trial will demonstrate that emissions from the Gavin Plant have been reduced to

levels below those present prior to the 2001 installation and operation of the SCRs.  As was the

---

[15] Id. at *8.

[16] Id.

[17] Smith v. Potter, 187 F. Supp. at 98; Chemical Weapons II, 2003 U.S. App. LEXIS 5359 at *12-13.

case in <u>Potter</u> and <u>Chemical Weapons II</u>, where measures have been implemented that successfully address the threat complained of, and mitigate any potential exposures to levels below those previously existing, there can be no finding of imminent or substantial endangerment.[18] The threatened harm complained of is too remote or speculative to meet the standards under RCRA, and does not threaten to occur immediately, as required by the Supreme Court's decision in <u>Meghrig</u>. And, as the term "imminent and substantial endangerment" has been applied in various federal court decisions, the current levels of sulfuric acid emissions from the Gavin Plant do not pose an imminent and substantial endangerment to the Cheshire, Ohio community.

For all of the above reasons, OPC submits that the current emissions from the Gavin Plant do not pose an imminent and substantial endangerment to members of the surrounding community under 42 U.S.C. § 6972(a)(1)(B).

**II.      CAP'S "imminent and substantial endangerment" Claim under 42 U.S.C. §6972(a)(1)(B) Should be Rejected as a Collateral Attack on OPC's Mitigation Obligations Under the Memorandum of Agreement with USEPA and Ohio EPA.**

OPC's Gavin Plant is comprehensively regulated under the federal Clean Air Act, 42 U.S.C. §§7401 <u>et</u> <u>seq</u>., and the Ohio Air Pollution Code, Chapter 3704, Ohio Revised Code. As part of its continuing compliance obligations under those statutes, and in direct response to the concerns expressed about the emissions of sulfuric acid from the Gavin Plant, OPC entered into

---

[18] Such a finding is supported by the fact that OPC's mitigation efforts were undertaken pursuant to a written cooperative agreement with the United States Environmental Protection Agency ("USEPA") and the Ohio Environmental Protection Agency ("Ohio EPA"), that OPC's obligations under that written agreement have been fully performed, and that OPC has continued to undertake additional mitigation efforts following the expiration of that written agreement. At no time has USEPA or Ohio EPA issued any orders, provided any notice, or otherwise indicated that the efforts undertaken by OPC were not fully adequate to mitigate the increased $SO_3$ emissions associated with the start-up of the SCRs.

a Memorandum of Agreement ("MOA") with the USEPA and the Ohio EPA in May, 2002.[19]  A

copy of the MOA is attached to this Brief as Exhibit A.

Among other requirements, the MOA obligated OPC to:

1.    not operate the selective catalytic reduction system on Gavin Power
       Plant Unit No. 1 during 2002;

2.    prior to commencing operation of the SCR on Unit No. 2 in 2002, to
       "complete installation of all equipment necessary to operate and
       maintain and monitor magnesium hydroxide (MaOH) injection,
       water injection and calcium hydroxide (CaOH) injection at Unit
       No. 2 to reduce sulfur trioxide ($SO_3$) levels; and

3.    to continue to evaluate alternative $SO_3$ mitigation systems,
        including but not limited to the use of other sorbent
       additives, catalyst changes to reduce the $SO_3$ conversion rate,
       application of wet ESP technology and use of low sulfur coal.

*See* MOA at ¶¶ 4, 5 and 7.

The MOA also committed OPC to conduct stack emission tests specifically for sulfuric

acid.   OPC also agreed to submit an ambient air monitoring plan for both sulfur dioxide ($SO_2$)

and sulfuric acid and, upon approval of the plan, to conduct sampling of the ambient air in the

Cheshire community during the 2002 summer ozone season.   OPC also agreed to submit bi-

monthly reports to USEPA and Ohio EPA, along with all emission data and ambient air sampling

data that had been collected.  See MOA at ¶¶ 21-22.

The evidence at trial will demonstrate that OPC has complied faithfully with all of its

obligations under the MOA.  In fact, the evidence will demonstrate that not only did OPC

continue to evaluate alternative $SO_3$ mitigation systems at the Gavin Plant, as required by the

MOA,  it  also implemented additional measures to further reduce sulfuric acid emissions from

---

[19] On May 8, 2002, U.S. EPA Region V issued a press release announcing the MOA as "a cooperative agreement to
control emissions of sulfuric acid and other air pollutants from AEP's General Gavin plant, Cheshire, Ohio."  *EPA,
Ohio EPA Reach Agreement with AEP Gavin Plant*, No. 02-OPA062, available at:
http://www.epa.gov/Region5/news/news02/02opa062.htm (last visited July 28, 2006).

the Gavin Plant.  In particular, the evidence will show that OPC has installed a system utilizing a more effective sorbent --- Trona --- to reduce sulfuric acid concentrations in its flue gases; and it has changed the catalyst utilized in the SCRs to substantially reduce the conversion of $SO_2$ to $SO_3$ when flue gases pass through the SCRs.

The evidence at trial will further demonstrate that sulfuric acid emissions have been reduced to levels that are below the levels of sulfuric acid emissions that occurred before the SCRs were installed at the Gavin Plant in 2001.  In short, OPC has taken measures to fully mitigate the conditions which form the basis for the claims in CAP's Amended Complaint.

CAP's allegations that emissions of sulfuric acid pose an imminent and substantial endangerment to public health, in effect, seek to disregard the provisions of the MOA and impose a different remedy on OPC than was agreed upon in the MOA.  CAP seeks to "end run" the provisions of the MOA, and the comprehensive regulation of the Gavin Plant under the Clean Air Act ("CAA") by alleging that the same air emissions that were covered by the MOA constitute an "imminent and substantial endangerment" under RCRA, and therefore should be covered by an injunctive order which would subject the Gavin Plant to regulation under a federal environmental statute – RCRA –  which was not designed to address the emission of pollutants into the ambient air.

CAP should not be permitted to collaterally attack the MOA using RCRA's "imminent and substantial endangerment" provisions.  The CAA provided CAP with a mechanism to challenge USEPA's view.[20]  42 U.S.C. § 7607 of the CAA allows citizens to file a "petition for

---

[20] The MOA specifically states that:

> The Parties have a common goal though entry of this MOA to meet the standards applicable to Unit No. 1 and Unit No. 2 under the Clean Air Act and/or the approved Ohio SIP including OAC Rule 3745-15-07, OAC Rule 3745-17-07(A), and OAC Rule 3745-17-10, and to set for the testing a monitoring and reporting program schedule.

review of . . . final action taken" by USEPA's Administrator, so long as the petition is filed within 60 days of that action.[21] The sixty-day limit is an important feature of this right to review. Without it, agency actions would be subject to attack months or even years after the fact. Regulated parties could not rely on the agency's decisions, and make investments based on them, because of the potential future threat that a later suit might overturn or alter them. The sixty-day limit on judicial review assures finality in agency decisionmaking, and this is critical to making the statutory scheme work.[22]

CAP could have filed a petition to review the MOA. But, CAP did not avail itself of this CAA course of action. Instead, it waited for more than two years after the execution of the MOA, and until after OPC had performed a substantial part of its obligations to implement measures for reducing and monitoring $SO_3$ under the MOA, and then commenced a RCRA suit that, in substance, challenges the adequacy of the remedial obligations required under the MOA. Allowing CAP to utilize RCRA's citizen suit provisions to challenge the adequacy of the CAA-related remedial obligations under the MOA would permit CAP to circumvent the 60-day limit on petitions for judicial review under the CAA. Such an allowance also would create a conflict between obligations on OPC under the CAA-based MOA and additional obligations which CAP

MOA at ¶ 3. If CAP believed that these agreements were insufficient to meet the applicable standards of the CAA or Ohio law, they could have commenced an action under the applicable provisions for review of federal actions or initiated a complaint under state law. 42 U.S.C. § 7607; O.R.C. § 3745.08.

[21] 42 U.S.C. § 7607.

[22] See Eagle-Picher Industries v. EPA, 759 F.2d 905, 911 (D.C. Cir. 1985) ("timeliness requirements reflect a 'deliberate congressional choice to impose statutory finality on agency orders, a choice we may not second-guess"); Hawaiian Electrical Company v. EPA, 723 F.2d 1440, 1445 (9th Cir. 1984) ("The policy of finality . . . is critical to the administration of a complex technocratic program . . . Finality is a particularly important value in air pollution control because of the simultaneous existence of substantial risk and substantial technical uncertainty."); Palumbo v. Waste Technologies Industries 989 F.2d 156, 162 (4th Cir. 1993) (holding, "In short, for an uncertain length of time after the agency issues the [RCRA] permit, the permit-holder would face the very real threat that the inquiry into the validity of its permit might be reopened in an altogether different forum. This threat will have one long-term effect: otherwise worthy permit applicants will weigh the formidable costs in delay and litigation, and simply will not apply.").

seeks to have this Court impose under RCRA. And, all of this would rob the MOA of all finality. This kind of collateral second-guessing of remedies which were implemented with full review and agreement from USEPA and Ohio EPA should not be countenanced.[23]

RCRA recognizes the harm that would result from overlapping obligations under the CAA and other environmental laws, and contains language to prevent it. 42 U.S.C. § 6905(b)(1) of RCRA, titled "Integration with other Acts," expressly instructs the USEPA to "avoid duplication, to the maximum extent practicable, with the appropriate provisions of the Clean Air Act" and of the other federal environmental statutes.[24] This provision expressly requires USEPA and, by implication, the courts, to interpret and implement RCRA in such as way as to preserve its separation from the CAA and to minimize duplication.

United States v. Burns well illustrates this principle.[25] Burns involved a company that had accepted PCB-laden oil destined for disposal and stored it in its warehouse. The United States sued the company for a violation of the Toxic Substances Control Act ("TSCA"). The parties resolved the suit through a consent order, approved by the court, under which the United States was to transfer the PCB-laden oil to a secure storage facility.[26] Subsequently, the United States discovered PCB contamination outside defendants' warehouse and brought action under RCRA, 42 U.S.C. § 6973, alleging that the contamination presented an "imminent and

---

[23] See Brown v. General Services Admin., 425 U.S. 820, 833 (1976) ("it would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading"); Waste Management of Illinois, Inc. v. EPA, 714 F. Supp. 340, 346 (N.D. Ill. 1989) ("Restrictions on [a court's] subject matter jurisdiction cannot be circumvented by artful pleading.").

[24] 42 U.S.C. § 6905(b)(1) (emphasis added).

[25] 512 F. Supp. 916 (W.D. Pa., 1981).

[26] Id. at 917.

substantial endangerment to health or the environment" and seeking injunctive relief.[27] Defendants countered that the United States already had regulated them under TSCA and that RCRA's integration provision, 42 U.S.C. § 6905(b) precluded simultaneous RCRA regulation.[28]

The court agreed and dismissed the RCRA claim. It focused on the fact that defendants already were "fully regulated under TSCA," that USEPA had promulgated "comprehensive [TSCA] regulations dealing with disposal of PCBs, as well as the handling and storage of PCBs," and that TSCA even contained a provision entitled "Imminent Hazards" that allowed the United States to bring an action in the event that a chemical substance posed an "unreasonable risk."[29] The court held that where a statute such as TSCA already provides such comprehensive regulation of the substance, allowing a parallel RCRA action to go forward "would permit the kind of duplication that section 1006(b) of RCRA [the Integration provision] is designed to prevent."[30]

A similar result was reached in Jones v. Snell,[31] where a property owner commenced a citizen suit action alleging that storm water runoff from a highway onto her property violated RCRA's prohibition against "open dumping," contending that the storm water contained sediment which was being deposited, or openly dumped upon her property. The district court rejected this claim, holding that the storm water was comprehensively regulated under the federal

---

[27] Id. at 917-918 & n. 2.

[28] Id. at 918 (stating, "The Administrator shall integrate all provisions of this chapter for purposes of administration and enforcement and *shall avoid duplication, to the maximum extent practicable, with the appropriate provisions of the Clean Air Act*…. Such integration shall be effected only to the extent that it can be done in a manner consistent with the goals and policies expressed in this chapter and in other acts referred to in this subsection.") (emphasis added).

[29] Id. at 919, (citing TSCA, 42 U.S.C. § 2606(b)).

[30] Id. at 919.

[31] 333 F. Supp. 2d 1344 (N.D. Ga. 2004).

Clean Water Act.  The Court specifically noted RCRA's language in 42 U.S.C. §6905 in reaching

this result:

> In Section 6905 Congress provided the EPA with guidelines for applying
> and integrating the Recovery Act with other legislation, including the Clean
> Water Act, and should, to the maximum extent possible, avoid duplication with
> its provisions.[32]

CAP's claim is similar to those claims rejected in <u>Burns</u>, <u>Jones</u>, and <u>Chemical Weapons</u>

<u>I</u>.[33]  The CAA, much like TSCA and the Clean Water Act, provides authority for USEPA to bring

suit in the event that a source's air emissions are "presenting an imminent and substantial

endangerment to public health and welfare."[34]  As in <u>Burns</u>, it is pertinent that the agency has

never exercised this authority.  That simply reflects USEPA's determination that the current

situation does not pose an imminent or substantial endangerment – an enforcement choice that is

informed by the agency's expertise in air emission sources and their impacts, and well within the

---

[32] <u>Id</u>. at 1350.

[33] In <u>Chemical Weapons</u> 111 F.3d 1485 (10th Cir. 1997) (Chemical Weapons I), the Tenth Circuit Court of Appeals addressed a similar problem of using different federal environmental statutes to challenge actions which already were comprehensively regulated.  The U.S. Army was incinerating chemical weapons at its Tooele facility.  Some of the emissions from the incinerator's stack migrated their way into navigable waters.  Plaintiffs argued that this violated Clean Water Act, 33 U.S.C. § 1311(f), which makes it "unlawful to discharge any radiological, chemical or biological warfare agent . . . into navigable waters," and sued to enjoin further emissions from the facility.  The Tenth Circuit refused to read the Clean Water Act so broadly as to include the atmospheric deposition into navigable waters. <u>Id.</u> at 1490.   The court explained that the CAA already governed the facility and allowed the very air emissions plaintiffs' Clean Water Act suit sought to enjoin.  Granting plaintiffs' claim would accordingly "create a regulatory conflict between the Clean Water Act and the Clean Air Act," and this would be "inconsistent with congressional intent." <u>Id</u>. at 1490.  For these reasons, the court held that the CWA must be construed to "not apply to Tooele's stack emissions." <u>Id</u>. at 1491.  The court specifically noted that:

> Because Tooele's Clean Air Act Permit specifically allows the
> discharges that Plaintiffs claim are barred under the Clean Water Act
> §301(f), applying that provision to Tooele's stack emissions would
> create an irreconcilable conflict between regulatory regimes.  We decline
> Plaintiffs' invitation to create such a conflict, especially since the
> pollution effects of atmospheric deposition are expressly considered
> and regulated under the Clean Air Act.  See e.g. 42 U.S.C. §7403(e)(4)
> (requiring Environmental Protection Agency to evaluate "the effects of
> air pollution on water quality) §§7651(a)-(o)(regulating pollution sources
> of acid rain). 111 F.3d at 1490-91.

[34] 42 U.S.C. § 7603; O.R.C. § 3704.032.

agency's discretionary authority. Where the United States has adequate authority to bring such an action under the comprehensive structure of the CAA, a parallel suit under the RCRA is duplicative of existing CAA regulation and so directly violates the Integration requirement of RCRA, 42 U.S.C. § 6905(b).[35]

### III.    CAP's RCRA Claim Must Fail Because There Is No Present Threat.

Even if CAP had been able to have proven a violation of RCRA in 2001, their claim in this litigation is barred because the activity in 2001 that allegedly constituted an "imminent and substantial" endangerment is no longer occurring, and there is no evidence that there is any remaining threat from that past activity.

Under 42 U.S.C. 6972(a)(1)(B), citizens may bring suit against individuals "contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." While the language anticipates that the actual handling or storage of waste could have occurred in the past, the actual threat posed by the material must be a present one – or "imminent." The Supreme Court is clear that "the reference to waste which 'may present' imminent harm quite clearly excludes waste that no longer presents such a danger."[36] Therefore, where there is no continuing threat, *i.e.* where the threat has passed, the citizen's suit must fail.

In cases where past actions have formed the basis for citizens suits long after the disposals occurred, the wastes were deposited in such a way that they continued to contaminate

---

[35] See Burns, 512 F. Supp. at 919.  See also Jones v. Snell, 333 F. Supp. 2d 1344, 1350 (N.D. Ga. 2004) (where Clean Water Act already regulates defendant's action in causing increased storm water run-off onto plaintiff's property, RCRA integration provision prohibits parallel RCRA suit focusing on the same activity).

[36] Meghrig, 516 U.S. 479 at 485-486 .

the land or water. In <u>Gache v. Town of Harrison, New York</u>,[37] the district court explained the

type of past action that could constitute a current – or imminent – threat.

> The environmental harms do not stem from the act of dumping
> when waste materials slide off the dump truck, but rather **after
> they land and begin to seep into the ground, contaminating soil
> and water**. So long as wastes **remain in the landfill** threatening
> to leach into the surrounding soil and water, a continuing violation
> surely may exist.[38]

Because the violation was causing a continuing threat, the court ruled that it was not "wholly

past." In other words, citizens suits only lie "where the effects of the violation remain

remediable."[39]

As the Court ruled in its July 16, 2006, RCRA Opinion, "CAP has not produced a single

piece of evidence" that "at least a trace amount of the flue gases are, or were, present in any land

in and around the Gavin Plant."[40] In other words, there is no lingering effect from past

emissions. CAP must – but cannot – prove that <u>current</u> sulfuric acid emissions from the Gavin

Plant that may touch on land for the brief periods of time that the plume may descend to ground

level, and which have reduced substantially since the installation of the SCRs, are somehow high

enough to <u>currently</u> posing an imminent and substantial endangerment of public health. CAP

cannot produce any evidence that emissions are at or above the levels that they were in 2001. In

fact, all of the evidence clearly shows that emissions are substantially lower than they were in

2001.[41] CAP members do not claim that any threat was present due to sulfuric acid emissions

---

[37] <u>Gache v. Town of Harrison, New York</u>, 813 F. Supp. 1037, 1041 (S.D.N.Y. 1993).

[38] <u>Id.</u> at 1041 (emphasis added).

[39] <u>Id.</u> at 1042, <u>citing</u> <u>Fallowfield Development Corp. v. Strunk</u>, 1990 U.S. Dist. LEXIS 4820, *29-33 (E.D. Pa. 1990).

[40] RCRA Opinion at 9-10.

[41] See Joint Stipulations, Doc. No. 53.

prior to 2001. Therefore, even if plume touchdowns are occurring in the community, a fact that cannot be substantiated, and even if CAP members are experiencing some symptoms attributed to some sort of irritant, they cannot attribute those symptoms to sulfuric acid emissions, let alone to sulfuric acid emissions from the Gavin Plant.

For these reasons, for the reasons set out in prior briefings on this issue before this Court, and based on the evidence to be presented at trial, CAP cannot and will not prove an imminent and substantial endangerment to public health may exist from the Gavin plant emissions.

**IV. OPC Correctly Determined that its Sulfuric Acid Emissions Were "Stable In Quantity and Rate" In Order to Qualify for the Continuous Release Reporting Exemption under 40 CFR §302.8.**

This Court has determined, in its Opinion and Order,[42] that the Gavin Plant's sulfuric acid emissions are "continuous." This Court also has framed the remaining issue as "whether OPC had a sound technical basis for its conclusion that the sulfuric acid emissions were stable in quantity and rate."[43]

In order to establish that emissions of sulfuric acid are "stable in quantity and rate," USEPA requires that there be a demonstration that the release is "predictable and regular."[44] And, as this Court has noted, the total amount of the release and normal range of the release must have a "sound technical basis."[45] Moreover, USEPA also has indicated that "releases need not be uniform in quantity and rate in order to be considered stable."[46]

---

[42] Opinion and Order regarding Cross Motions for Summary Judgment, Counts 2 and 3 ("CERCLA/EPCRA Opinion"), July 20, 2006, Doc. No. 86

[43] Id. at 12 and 15.

[44] 55 Fed. Reg. 30166, 30170-71 (July 24, 1990).

[45] Id. at 30174.

[46] Id. at 30171.

In establishing the technical basis for its estimate of sulfuric acid releases, OPC is allowed to rely upon "…engineering estimates, mass balance equations, or other estimating techniques as used by the person in charge of the facility, as well as any data available from monitoring that is being performed currently."[47]  OPC will demonstrate at trial that sound technical procedures, including test data, engineering estimates, and detailed knowledge about the coal combustion process and its associated variations in fuel quality, hours of operation, operating modes, and other factors, were used to estimate the upper bound of sulfuric acid emissions.   Moreover, OPC witnesses will establish that the creation of $SO_3$ at the Gavin Plant is the result of the predictable and regular formation of $SO_3$ in the boiler and the SCR systems. Therefore, a sound technical basis exists for concluding that OPC's emissions are stable in quantity and rate.

**V.      The Remedies Available if CAP Prevails Are Limited.**

OPC firmly believes that CAP cannot prevail on any of the three claims presented.  OPC nonetheless addresses the limited remedies available to CAP if it were to prevail.  All three claims in CAP's Amended Complaint are brought under citizen suit provisions of environmental statutes.  These citizen suit provisions limit the types of relief that citizen plaintiffs are entitled to seek if they are successful on the merits of their claims.  OPC explains each of these remedies in accordance with this Court's prior Orders, and OPC's positions on those possible remedies below.[48]

---

[47] Id. at 30174.

[48] OPC notes that the citizen suit provisions in some cases provide for attorney's fees, but does not address those fees for the purposes of this briefing.  OPC respectfully reserves its right to address such issues if that becomes necessary by order of the Court.

**A.      Injunctive Relief Is the Only Available Remedy Under RCRA.**

OPC first addresses the available remedy under Count 1 of CAP's Amended Complaint under RCRA.  As the Court noted in its RCRA Opinion, "[o]nly injunctive relief is available under the citizen suit portion of the RCRA."[49]  Such injunctive relief is limited to that relief necessary to abate any imminent and substantial endangerment to public health that the Court may find.[50]

CAP does not allege that there was any imminent and substantial endangerment to the health of Cheshire residents prior to the increased levels of sulfuric acid emissions that came with the installation and operation of the SCRs in 2001.  OPC has made extensive efforts since that time to return levels of sulfuric acid emissions to a level at or substantially below the pre-SCR level.[51]  Simply put, there is nothing left to abate.  CAP will not be able to offer adequate evidence for the Court to impose additional injunctive relief because OPC is already applying effective and reliable measures to control sulfuric acid emissions from Gavin through the use of the Trona system and the substitution of catalysts in the SCRs to reduce the formation of $SO_3$.[52] As will be shown at trial, the Gavin Plant is able to operate reliably in the range of 10-15 ppm of $H_2SO_4$, a level well below pre-SCR levels.

Thus, at most, if CAP convinces the Court that an imminent and substantial endangerment to public health may be posed by the operation of the SCRs at the Gavin Plant, OPC respectfully submits that the Court should act by making this 10-15 ppm operating range

---

[49] RCRA Opinion at 6, citing Meghrig, 516 U.S. at 489.

[50] CAP has not alleged nor elicited evidence of any potential environmental harm.

[51] See generally, Expert Report of Michael Durner.

[52] Id.

mandatory through an injunction rather than voluntary.[53]  A range, as opposed to one fixed

number, is necessary because of the variable operating conditions, fuel sulfur content, and the

myriad of other factors that can affect instantaneous concentrations of $SO_3$ at the stacks.

OPC disputes that increased emissions of sulfuric acid from the Gavin Plant following

the installation of the SCRs have ever posed any threat to public health.  Still, OPC responded to

the situation immediately and effectively to abate any possible hazard, and now operates reliably

within a range well below that at which CAP expressed concern.  If CAP succeeds under its

RCRA claim, the extent of proper injunctive relief would be to direct OPC to continue to operate

using the Trona system (or a commensurate alternative) to maintain emissions within a

mandatory range of 10-15 ppm of sulfuric acid at the stack.

### B.  Civil Penalties and Future Compliance Are the Only Remedies Available Under CERCLA/EPCRA.

If CAP were to prevail on its reporting claims, Counts 2 and 3 of the Amended

Complaint, the only remedies available would be an order imposing civil penalties payable to the

USEPA Administrator, and ordering the Gavin Plant to comply with the applicable reporting

obligations going forward.[54]  CAP has asked the Court to declare that the facility is not eligible

for Continuous Release reporting.[55]  As the Court is well aware, if a facility is not entitled to use

the Continuous Release Rule, it is required to file reports with several agencies any time the

facility emits more that 1,000 pounds of sulfuric acid in a given 24-hour period.[56]  Absent the

---

[53] OPC respectfully submits that even such a remedy is unnecessary and duplicative, since the responsible regulatory agencies continuously monitor OPC's operations at the Gavin Plant and would likely respond quickly to any unexplained increase in sulfuric acid emissions.

[54] See 42 U.S.C. §§ 9659(a)(1), (c), 9609(c)(1) (CRCLA provisions); 42 U.S.C. §§ 11046 (a)(1)(A)(i)(c), 11045(b)(3) (EPCRA provisions).

[55] See Pltf.'s Mot. Summ. J., Doc. No. 61.

[56] See CERCLA/EPCRA Opinion at 7, citing 42 U.S.C. §9603(a); 42 U.S.C. §11004(a)(1), (b).

Continuous Release Rule, facilities like the Gavin Plant, whose normal operations result in routine releases in excess of a reportable quantity, would be obligated to file a report each day with the National Response Center and also with state and local emergency planning officials.

Except on days where the units were out of service, this would result in gathering various kinds of data, performing calculations, and making the numerous telephonic and written communications every day, as well as making the required follow up notifications every day.[57] The Continuous Release Rule avoids this incredibly duplicative and burdensome process by requiring reporting a range of reportable releases. The purpose of release reporting is "to alert the appropriate government officials to releases of hazardous substances that may require rapid response to protect public health and welfare and the environment."[58] There has been no allegation that the daily range reported by the Gavin Plant – and within which it regularly operates – has been cause of concern for local or national authorities. Indeed, the initial continuous release notifications and annual updates have not prompted any response action on the part of those emergency managers.

There is simply no middle ground between the requirements under the CERCLA and EPCRA provisions. Either the facility is entitled to use the Continuous Release Reporting mechanism to report a range within which it operates, or it is required to estimate every single daily release from each stack and report to several agencies on a daily basis. Even if the Court were to find that OPC did not have a sound technical basis upon which to estimate the range of sulfuric acid emissions from the Gavin Plant at the time its July 2001 notification was made, OPC certainly today possesses a wealth of technical and testing data upon which to calculate a

---

[57] See 42 U.S.C. §11004(c).

[58] 50 Fed. Reg. 13,456 (April 4, 1985).

reliable estimate of its upper bound of emissions, and should be entitled to utilize the Continuous Release Reporting mechanism on a prospective basis.

OPC asks that if a prior reporting violation is proved by CAP, the Court impose at most a minimal penalty, if any, for any imperfections in its estimates, rather than rob the facility of the opportunity to utilize reduced reporting, which would place a heavy burden not only on OPC, but on all of the agencies and officials to whom the facility would have to report by telephone and written communication on virtually a daily basis. Such a remedy fully effectuates the purposes of the reporting requirements, and satisfies the public's need for information. The fact that the responsible agencies and officials have never expressed concern over reporting provided by the Gavin Plant further supports the imposition of minimal, if any penalties, and continued use of the Continuous Release Reporting mechanism.

## VI.  Conclusion

For these reasons, the reasons set forth in prior briefings on these issues before this Court, and based on the evidence to be presented at trial on the limited remaining issue, Defendant Ohio Power Company respectfully requests that the Court enter judgment on its behalf and dismiss CAP's claims with prejudice.

Respectfully Submitted,

*s/ Alvin J. McKenna*
Alvin J. McKenna (0023145), Trial Attorney
Mason Evans (0023071), Of Counsel
Christopher Schraff (0023030), Of Counsel
Molly S. Crabtree (0073823), Of Counsel
Porter, Wright, Morris & Arthur, LLP
41 South High Street
Columbus, OH 43215
(614) 227-2000
amckenna@porterwright.com
mevans@porterwright.com
cschraff@porterwright.com

20

mcrabtree@porterwright.com

OF COUNSEL:

D. Michael Miller (0023117)
Janet J. Henry (0022949)
American Electric Power Service Corp.
1 Riverside Plaza, 29th Floor
Columbus, OH 43215-2355
(614) 716-1000
dmmiller@aep.com
jjhenry@aep.com

Counsel for Defendant Ohio Power
Company

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of September, 2006, I electronically filed the foregoing Trial Brief of Defendant Ohio Power Company with the Clerk of Court using the CM/ECF system which will send notification to all Counsel of record.

*s/ Molly S. Crabtree*_____
Molly S. Crabtree (0073823)

Attorney for Defendant
Ohio Power Company

COLUMBUS/1323787 v.01